IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION

| | | |
|---|---|---|
| JASON TORGERSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. |
| | ) | 12-3147-CV-S-REL-SSA |
| CAROLYN W. COLVIN, Acting | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff Jason Torgerson seeks review of the final decision of the Commissioner of
Social Security denying plaintiff's application for disability benefits under Titles II and XVI of
the Social Security Act ("the Act"). Plaintiff argues that the ALJ erred in (1) failing to point to
substantial evidence in the record to support a conclusion that plaintiff's disability ended on
May 31, 2010, (2) failing to assess a proper residual functional capacity by finding that
plaintiff suffers from severe headaches and multiple joint myalgias but not providing any
corresponding limitations, and (3) improperly finding plaintiff not credible. I find that the
substantial evidence in the record as a whole supports the ALJ's finding that plaintiff was not
disabled before April 1, 2009, or after May 31, 2010. Therefore, plaintiff's motion for
summary judgment will be denied and the decision of the Commissioner will be affirmed.

*I.      BACKGROUND*

On April 26, 2009, plaintiff, age 33 at the time, applied for disability benefits alleging
that he had been disabled since May 13, 2008. Plaintiff's disability stems from depression,
anxiety, and agoraphobia.[1] Plaintiff's application was denied on June 11, 2009. On November

---

[1]"Agoraphobia is a type of anxiety disorder in which you avoid situations that you're afraid
might cause you to panic. You might avoid being alone, leaving your home or any situation
where you could feel trapped, embarrassed or helpless if you do panic. People with
agoraphobia often have a hard time feeling safe in any public place, especially where crowds
gather. The fears can be so overwhelming that you may be essentially trapped in your own

9, 2010, a hearing was held before an Administrative Law Judge.  On June 3, 2011, the ALJ entered a partially-favorable decision, finding plaintiff disabled from April 1, 2009 (but not before), through May 31, 2010 (but not thereafter).  On December 16, 2011, the Appeals Council denied plaintiff's request for review.  Therefore, the decision of the ALJ stands as the final decision of the Commissioner.

## II.      STANDARD FOR JUDICIAL REVIEW

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner.  The standard for judicial review by the federal district court is whether the decision of the Commissioner was supported by substantial evidence.  42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Mittlestedt v. Apfel, 204 F.3d 847, 850-51 (8th Cir. 2000); Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997); Andler v. Chater, 100 F.3d 1389, 1392 (8th Cir. 1996).  The determination of whether the Commissioner's decision is supported by substantial evidence requires review of the entire record, considering the evidence in support of and in opposition to the Commissioner's decision.  Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951); Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989).  "The Court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory."  Wilcutts v. Apfel, 143 F.3d 1134, 1136 (8th Cir. 1998) (citing Steadman v. Securities & Exchange Commission, 450 U.S. 91, 99 (1981)).

Substantial evidence means "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Richardson

---

home.  Agoraphobia treatment can be tough because it usually means confronting your fears.  But with medications and psychotherapy, you can escape the trap of agoraphobia and live a more enjoyable life."  http://www.mayoclinic.com/health/agoraphobia/DS00894

v. Perales, 402 U.S. at 401; Jernigan v. Sullivan, 948 F.2d 1070, 1073 n. 5 (8th Cir. 1991). However, the substantial evidence standard presupposes a zone of choice within which the decision makers can go either way, without interference by the courts. "[A]n administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision." Id.; Clarke v. Bowen, 843 F.2d 271, 272-73 (8th Cir. 1988).

## III. BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS

An individual claiming disability benefits has the burden of proving he is unable to return to past relevant work by reason of a medically-determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A). If the plaintiff establishes that he is unable to return to past relevant work because of the disability, the burden of persuasion shifts to the Commissioner to establish that there is some other type of substantial gainful activity in the national economy that the plaintiff can perform. Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000); Brock v. Apfel, 118 F. Supp. 2d 974 (W.D. Mo. 2000).

The Social Security Administration has promulgated detailed regulations setting out a sequential evaluation process to determine whether a claimant is disabled. These regulations are codified at 20 C.F.R. §§ 404.1501, et seq. The five-step sequential evaluation process used by the Commissioner is outlined in 20 C.F.R. § 404.1520 and is summarized as follows:

1.     Is the claimant performing substantial gainful activity?

        Yes = not disabled.
        No = go to next step.

2.     Does the claimant have a severe impairment or a combination of impairments which significantly limits his ability to do basic work activities?

        No = not disabled.
        Yes = go to next step.

3.      Does the impairment meet or equal a listed impairment in Appendix 1?

        Yes = disabled.
        No = go to next step.

4.      Does the impairment prevent the claimant from doing past relevant work?

        No = not disabled.
        Yes =  go to next step where burden shifts to Commissioner.

5.      Does the impairment prevent the claimant from doing any other work?

        Yes = disabled.
        No = not disabled.

## IV.     THE RECORD

The record consists of the testimony of plaintiff and vocational expert Michael Lala, in addition to documentary evidence admitted at the hearing.

## A.     ADMINISTRATIVE REPORTS

The record contains the following administrative reports:

### Application for Disability Benefits

In his application, plaintiff reported that he was receiving $1,228 per month in unemployment compensation (Tr. at 121).

### Earnings Record

The record shows that plaintiff earned the following income from 1990 through 2010:

| Year | Earnings | Year | Earnings |
|------|----------|------|----------|
| 1990 | $ 647.00 | 2001 | $ 16,540.49 |
| 1991 | 0.00 | 2002 | 18,038.71 |
| 1992 | 912.04 | 2003 | 20,933.95 |
| 1993 | 1,485.00 | 2004 | 19,670.28 |
| 1994 | 1,952.42 | 2005 | 13,764.99 |
| 1995 | 2,715.45 | 2006 | 16,422.77 |
| 1996 | 5,211.54 | 2007 | 24,172.28 |

| 1997 | 5,370.42  | 2008 | 8,322.07 |
|------|-----------|------|----------|
| 1998 | 2,960.27  | 2009 | 0.00     |
| 1999 | 10,818.39 | 2010 | 0.00     |
| 2000 | 15,720.37 |      |          |

(Tr. at 135).

## Disability Report

In a Disability Report, plaintiff explained how his condition limits his ability to work:

I missed a large number of days with symptoms of my illness. Being unable to leave my apartment, get out of bed, or even do basic tasks. I had trouble concentrating on the tasks at hand, missed deadlines, and such. Last May I lost the last job I had because of my illnesses, and the number of days I had missed because of it. Due to the severity of the anxiety, and work history I have been unable to find another source of employment. I can not find the energy to get out of bed most days. I find it very hard to do anything or even live my life. Basic hygiene is even tough. The anxiety keeps me from leaving my apartment, going to places where other people might be, or even running basic errands. Thus making it hard to go to work or perform the tasks I have been asked to do. If I have a migraine, it can last for days. Leaving me immobile, for those days. Thus missing a lot of days of work.

(Tr. at 150).

. . . I have a hard time relating to others, and a very hard time making and keeping friends. All of this is because of my condition and the symptoms, and all of this is why it is impossible for me to find and hold a job at this time.

(Tr. at 158).

## Function Report

In a Function Report dated May 22, 2009, plaintiff described a typical day:

I get up, usually early, anymore. I am unable to sleep for very long, if I sleep at all. I will usually go to the bathroom first, then I feed the cat, if she is awake and screaming. Which she usually is. Then I fix myself something to drink and smoke a cigarette. I will usually turn on the TV for the noise and to see if there is anything interesting on to watch. On most occasions there is not. So I spend a few hours just flipping through the channels. I take my first rounds of meds at about 8 am. Sometimes, if I am hungry at that point I will make a bowl of cereal to eat. Most of the time, however, I don't. Usually, I will return to watching TV at that point. If I have a book that I am reading then I will try to read. If I am reading I will usually continue to do so until the book is done. With bathroom breaks and drink breaks of course. I usually drink tea, soda, water, or milk. No alcohol, so don't think that. Sometimes, I try to write in my journal

about what is running through my mind or happened to me. Trying to find some way to make sense of "life". This will usually continue until early afternoon, when I get hungry, if I didn't actually eat breakfast. If I have something I want to eat in the house, I will fix that. If not and I have to actually go out; then I will spend about an hour trying to "talk" myself into it, take a shower and get cleaned up, and get dressed. Then I will go for the food. Drive throughs, only! Or I will run to the grocery store and have a list to get in and out as quickly as possible. It is most often a short list. Then I will come straight back home. If the food needs to be prepared, I do that. Otherwise, I will eat in front of the TV or while reading. In the evening I usually watch movies if I have them or television shows that I watch regularly. If I have a book that I have been able to get into I will continue reading that. Oh, I take my second round of meds at the same time as when I am eating. About 9 to 10 I will start to get very tired. So I take my bedtime meds then, and go to bed usually around 11 pm. I have a very hard time falling asleep and so I am usually up and down or tossing and turning for a couple hours, until I actually fall asleep. Then I wake up at 4 am or 5 am and do it all again. This describes a day in which I have nothing else to do. No doctors or therapy appointments, no bills that need paying and no errands that need avoiding, but can no longer be. Also, not a day when any household chores actually need doing because the smell or the mess, gets aggresive [sic] and demands it, or one with headaches and such.

(Tr. at 176-183).

Plaintiff reported that he finds it hard to fall asleep, it is difficult to stay asleep, and sometimes he is "unable to sleep for days." He only gets dressed if he absolutely has to "(i.e., keeping appointments, etc.)", and he only eats once a day at the most. He does not need any special reminders to take care of personal needs and grooming. He does not need reminders to take medicine. He prepares his own meals for five to 30 minutes.

When asked to list the household chores he performs, plaintiff wrote "load dishes in dishwasher, take out trash, clean litter box, clean house". He waits until his sink is overflowing with dishes before washing them, he waits until he has at least two bags of trash before taking it out, he cleans the cat's litter box every other day, and he cleans for an hour maybe once a month. Plaintiff needs someone else to do his laundry "since [he has] no laundry facilities in [his] home." He does not do yard work because he finds it hard to do anything do to feeling tired a lot. When he goes out, he would much rather there be someone he trusts with him, "but there is not." He shops in stores for groceries, books, DVDs, art supplies, and

music.  Plaintiff wrote, "I have a hard time holding onto money."

Plaintiff's hobbies including reading, drawing, painting, watching movies and television, collecting and listening to music, and writing poetry.  He reads very well (four novels a week), he works on art daily or weekly and does that very well.  He watches television daily and does that well.  He writes poetry daily but does that poorly.  He reported that he does not do anything with others.  "Social situations have become tortuous and painful."  He goes to the doctor and counselor's offices once a week, and he does not need anyone to go with him or remind him to go.

He has difficulty getting along with others.  "I find it hard to trust anyone, hard to converse, people scare me.  I get physically sick when having to deal with anyone so I tend to keep things short and isolate myself so it is hard to 'get along' with anyone."  Plaintiff's condition affects his ability to talk, complete tasks, concentrate, and get along with others.  It does not affect his memory, his ability to understand, or his ability to follow instructions, nor does it affect any physical abilities.  Plaintiff said he can pay attention for 10 to 15 minutes but he can follow written and spoken instructions well.  He gets along with authority figures "fine".  He is unable to handle stress or changes in routine.

## Claimant's Recent Medical Treatment

On June 8, 2010, a three-page "recent medical treatment" form was prepared by plaintiff (Tr. at 196-199).  Plaintiff was asked what his doctors have told him about his condition.  He wrote:

> That I have Bipolar Major Depressive disorder and that it will never be "cured" only controled [sic] by medication and therapy.  That my severe anxiety disorders are in the same condition. That there is no known cause for my migraines and that they can only

be alieviated [sic] through medication and rest. And finally that my SVT[2] can be controled [sic] through medication.

## B.   *SUMMARY OF TESTIMONY*

During the November 9, 2010, hearing, plaintiff testified; and Michael Lala, a vocational expert, testified at the request of the ALJ.

### 1.   Plaintiff's testimony.

Plaintiff had a job at Bass Pro as a photographer, but got laid off (Tr. at 29). Another time when he was working for Bass Pro he was fired due to missing a lot of work (Tr. at 29). He was missing too much work because of his illness (Tr. at 29). He could not get up in the mornings, he could not function while he was at work, he was tired while he was at work, and he could not do the job they wanted him to do -- fabricating exhibits for Bass Pro, i.e., building the shooting arcades (Tr. at 29-30). Plaintiff said his problem with functioning at work was that he "could barely make it through." (Tr. at 30). He could not concentrate -- he went for a two-week period when he went without sleep (Tr. at 31). When asked to explain what about his job he was unable to concentrate on, plaintiff said, " I had to follow an actual blueprint plan and stuff, and I was unable to actually follow that plan to the specifications that they wanted me to." (Tr. at 31). Plaintiff's boss told him he should go see a doctor about his depression and his condition (Tr. at 32). His boss had observed that plaintiff was working too slowly and was having trouble concentrating (Tr. at 32). He observed that plaintiff was

---

[2]Supraventricular tachycardia (SVT) is a rapid heart rhythm of the upper heart chambers. In supraventricular tachycardia electrical signals travel from the upper chambers of the heart to the lower chambers of the heart. SVTs are usually 150-250 beats per minute but can be both slower or faster. SVTs are not felt to be life-threatening themselves. For many patients, most or all episodes of SVT stop on their own. The duration ranges widely from seconds to minutes and occasionally hours.
http://stanfordhospital.org/cardiovascularhealth/arrhythmia/conditions/supraventricular-ta
chycardia.html

fatigued and tired (Tr. at 32).  Plaintiff's boss's wife had depression issues so he encouraged

plaintiff to see a doctor about his depression (Tr. at 33).  Going to the doctor did not help, so

plaintiff was fired for missing too much work because of his illness (Tr. at 33).

Plaintiff is unable to work because "we're still trying to adjust my medications and find

a -- to get me to a normal spot.  I rapid cycle through depression and mania.  I suffer from

major insomnia because of my mania.  I have severe anxiety disorders that cause me to have

panic attacks, severe panic attacks that feels like I'm having a heart attack.  Basically, I've got

just a whole host of psychological issues that I'm still trying to deal with . . . [l]ike the bipolar

and the major depressive disorder.  And I'm just trying to find the right place for me to actually

live and function on a daily basis."

Plaintiff last attempted suicide in April 2009 (Tr. at 27).  That was also his last

hospitalization (Tr. at 27-28).

When asked why plaintiff would not be able to perform a job with one, two or three

steps on a repetitive basis, plaintiff said, "I'm still having trouble with the concentration part.

I'm still having issues with depression and with anxiety and with agoraphobia and with a lot of

the problems that I've been experiencing, I'm still having issues with." (Tr. at 33).  Plaintiff

used to be able to read a lot and he has not been able to finish a book for a couple months (Tr.

at 33-34).  He has trouble concentrating on what is going on in the story and he cannot focus

on what he is reading (Tr. at 34).  "I'll have to put it down like every five minutes and start

back over, reread passages that I've already read before and that, you know, is part of my

illness." (Tr. at 34).  When plaintiff has a panic attack, his heart races and it is hard to breathe

(Tr. at 34).  "I get real shaky, kind of like what I am right now.  I'm having a slight anxiety

attack right now." (Tr. at 34).  He also sweats and gets lightheaded (Tr. at 34).  Plaintiff has a

panic attack once or twice a week (Tr. at 34).  Sometimes they last four hours but on average

they last 15 to 30 minutes (Tr. at 34-35). When asked what brings on panic attacks, plaintiff said, "High pressure situations, going to the grocery store, having to leave my apartment. Taking out the trash will sometimes bring it on." (Tr. at 35). Plaintiff takes Klonopin three times a day but also takes it on an as-needed basis when he feels a panic attack beginning (Tr. at 35). His doctor knows he is doing that (Tr. at 35). Plaintiff has run out of his Klonopin early (Tr. at 35). When asked what his doctor said about that, plaintiff said, "That I have to just try and -- he's prescribed some other medications as well for it, that I try to kind of layer. If I start to run out, then --" (Tr. at 35-36).

Plaintiff sees Dr. H. J. Bains every two weeks to get prescription medications (Tr. at 25). He is a psychiatrist and he talks with plaintiff about what he has been going through and his mental state (Tr. at 25). Plaintiff also sees Jonathan Boswell and Della Goodwin at Jordan Valley Community Health (Tr. at 25). He sees Mr. Boswell about every four months and he sees Ms. Goodwin every other week (Tr. at 25). Plaintiff is no longer in group therapy (Tr. at 25). He is no longer in touch with any members of his group therapy (Tr. at 48). He is still friends with them on Facebook, but he does not hear from them otherwise (Tr. at 48). Plaintiff sees Ms. Goodwin for about 50 minutes at each appointment (Tr. at 26). Ms. Goodwin is working on anxiety issues right now "before going on to the depression issues." (Tr. at 40).

Plaintiff lives alone (Tr. at 26). Plaintiff's parents pay his rent (Tr. at 26). Plaintiff has friends whom he sees face to face (Tr. at 26). He usually sees them "at their place" or they go to the park together (Tr. at 26). Later he testified that he leaves his apartment three or four times a week to go over to a friend's house (Tr. at 36). When asked if he has difficulty doing that, plaintiff said, "Sometimes I do, but they're friends I can trust and so I feel like that it's a safe place that I can go." (Tr. at 36). Plaintiff has a driver's license and has no trouble driving, not even with nervousness (Tr. at 36).

Plaintiff continues to experience manic episodes during which he has rapid thoughts flying through his head and he cannot slow the thoughts down (Tr. at 37). He cannot concentrate, he cannot sleep, he cannot lie down and rest, he has to "just kind of keep moving and it's really kind of hard to describe exactly how the thought process works, but it just, it's like one thought just after another, after another, after another, and I can't actually get it to slow down. And that's what my manic episodes are like." (Tr. at 37). Plaintiff has a manic episode about once a month and it lasts about a day (Tr. at 37).

Plaintiff's depressive episodes make him tired and suicidal (Tr. at 38). He still has thoughts of suicide (Tr. at 38). A depressive episode will make him really sad and depressed, it wears his body out so that he feels muscle aches and pains (Tr. at 38). "My doctor's trying to address that with a new medication that he's put me on and that medication is Cymbalta. I don't know if you've heard of it. And, basically, it just wears me out." (Tr. at 38). Plaintiff only sleeps when he is in a depressive phase (Tr. at 38). A depressive phase will last for four weeks (Tr. at 38). He sleeps for "upwards of, you know, 12 to 16 hours a day during my depressed phases and then -- and basically, the only thing that I can do it stay in bed. I mean, I -- and I won't leave my apartment when I'm in a depressed phase." (Tr. at 38-39). When asked how often he has a depressive phase, plaintiff said, "I get those phases, I'm pretty much in those phases all the time." (Tr. at 39).

Plaintiff was asked about his previous testimony about going out multiple times a week with friends (Tr. at 39). About coming to the hearing, plaintiff testified as follows:

Q.    But you do manage to leave the house and I mean, you left today, and  you say you go see friends and things like that.

A.    Yes, I had friends who actually met me up here and that was one of the reasons why I was able to make it here today, was because I had friends who were able to get me here.

Q.    Did they drive you here today?

A.    No, they did not, but they met me up here. They came over beforehand and helped me to get ready and stuff and --

(Tr. at 39).

Plaintiff suffers from severe fatigue, dizziness, and some nausea due to his medication (Tr. at 26). The fatigue is the worst side effect, and plaintiff has been experiencing that since he started on the medication (Tr. at 26). He said Dr. Bains is still trying to adjust his medication levels (Tr. at 26). He began taking it in December 2009 (Tr. at 27).

Plaintiff smokes a pack of cigarettes a day because it calms him down (Tr. at 27). No one has told him not to smoke, not even Dr. Bains, his psychiatrist (Tr. at 27).

In a typical day, plaintiff will run out and go through a drive-through to get something to eat for lunch (Tr. at 40). In the afternoon, he will hang out with some friends and their place or go sit at a park if it's a nice day (Tr. at 40). He doesn't watch television (Tr. at 40). When asked about cleaning his apartment, he said he has a relatively hard time doing that: "My apartment is a mess, actually, right now, so." (Tr. at 40). When asked what about cleaning is difficult for him, plaintiff said getting motivated to clean is difficult (Tr. at 40). Plaintiff has trouble finishing things he starts -- for example, he is not motivated to take out the trash (Tr. at 41). "I get paranoid that people are watching me take out my trash and I don't know why, but it's just part of the whole anxiety thing." (Tr. at 41).

Plaintiff had a gallery show in San Francisco in December 2008 (Tr. at 45). Plaintiff was asked how he was able to do that after his alleged onset date (Tr. at 45). He said that it was old work he had already done (Tr. at 46). He had around 25 pieces in the show, and his parents paid to ship them by UPS (Tr. at 46-47). Plaintiff went to San Francisco for the show, but he did not physically hang the paintings at the show (Tr. at 47). He tried to help sell the

paintings and was basically the artist who was there to answer questions that people had about the work (Tr. at 47). Plaintiff was the only artist showing at that gallery at the time (Tr. at 47). Plaintiff was in San Francisco for three days (Tr. at 48). Plaintiff would stand by the paintings while potential purchasers and patrons talked to him about the paintings and asked him questions about the paintings and the process of creating the paintings (Tr. at 48). When asked how he was able to do that since it was after he alleges he was disabled, plaintiff said, "I don't know. I just was able to do it. I had my girlfriend out there with me. So I had a friend out there with me and she stood by my side the whole time and, basically, that's how I was able to do that. And talking about my art is one of the few things that I can actually, you know, once you get me going, I can actually keep going for a while, so." (Tr. at 48).

2.      Vocational expert testimony.

Vocational expert Michael Lala testified at the request of the Administrative Law Judge. He testified that plaintiff has had six jobs with seven job titles (Tr. at 43).

♦   Display maker, DOT 739.361-010, performed at the very heavy exertional level but performed at the medium level in the national economy, with an SVP[3] of 7

♦   Janitor, DOT 382.664-010, performed at the very heavy exertional level but performed at the medium level in the national economy, with an SVP of 3

♦   Exhibit builder, DOT 739.261-010, performed at the very heavy exertional level but performed at the medium level in the national economy, with an SVP of 7

♦   Photographer helper, DOT 976.667-010, performed at the medium exertional level by plaintiff and in the national economy, with an SVP of 4

♦   Counter clerk, DOT 249.336-010, performed at the medium exertional level but performed at the light level in the national economy, with an SVP of 2

---

[3]The Dictionary of Occupational Titles ("DOT") lists a specific vocational preparation ("SVP") time for each described occupation. Using the skill level definitions in 20 C.F.R. §§ 404.1568 and 416.968, unskilled work corresponds to an SVP of 1-2; semi-skilled work corresponds to an SVP of 3-4; and skilled work corresponds to an SVP of 5-9 in the DOT.

♦ Combination Sculptor, DOT 144.061-018, performed at the very heavy exertional level but performed at the light level nationally, with an SVP of 8, and Forming Machine Operator, DOT 556.685-082, performed at the very heavy exertional level but performed at the light level nationally, with an SVP of 2 (Tr. at 44-45).

The first hypothetical involved a person with no physical functional impairments but has the following mental limitations:  interaction with supervisors must be brief, such as pleasantries directly related to work production or job-related responsibilities or superficial.  It can occur no more than occasionally during the workday.  With those restrictions in place, the limitations would be "mild."  The person could have no contact with the public.  The person would have marked limitations at SVP 4 through 9.  At SVP 3 the limitations are no longer marked, but at SVP 3 a person could do the following types of things.  The person could make work-related decisions such that he could push a cart containing packages down a hall, at the end of the hall decide whether to turn left or right, and once making a turn, would deliver certain packages discriminated by either size or writing.  Then he would have to come back and turn the other way and drop off other packages (Tr. at 50).  At SVP 1 and 2, the person would have mild limitations in understanding, remembering and carrying out short, simple instructions (Tr. at 51).  The vocational expert testified that such a person could perform the job of Forming Machine Operator which is SVP 2 (Tr. at 51).

The second hypothetical incorporated the findings of Michael Murrell, Psy. D., dated January 21, 2010, and found at pages 280-282 of the transcript (Tr. at 51).  The form includes "not significantly limited," "moderately limited," "markedly limited," and "extremely limited."  The vocational expert was asked to disregard the limitations marked as "moderately" (Tr. at 52).  The vocational expert testified that such an individual could not work (Tr. at 52).

The third hypothetical[4] was the same as the first except the cart example was changed as follows:  This individual is capable of taking a cart to the beginning of a route, placing all the boxes that are in the designated area on the cart, pushing the cart to the end of the hall and taking those items off and placing them at one designated location (Tr. at 53-54).  The vocational expert testified that such a change would not affect his previous testimony, i.e., that such a person could perform plaintiff's past relevant work as a Forming Machine Operator (Tr. at 54).

## C.    *SUMMARY OF MEDICAL RECORDS*[5]

On March 17, 2008, plaintiff was seen by Scott Moose, M.D., to establish care (Tr. at 203).  Dr. Moose noted that plaintiff had been smoking a pack of cigarettes per day since he was 18 (or for the past approximately 14 years).  Plaintiff complained of symptoms of upper respiratory infection, insomnia and depression.  "He has wrestled with depression since his teenage years, seeing no benefit from counseling in the past.  Medication has been suggested but he has never tried anything."  Plaintiff reported two suicide attempts the previous year but no medical intervention. Dr. Moose observed that plaintiff was healthy appearing, in no acute distress.  "He is well-dressed and well-groomed and articulate without overt signs of anxiety or depression or somnolence [drowsiness]."  Plaintiff's exam was normal except he had bronchitis.  He was prescribed an antibiotic and told to cut back on cigarettes.  Dr. Moose prescribed Restoril 15 mg at bedtime for insomnia.  He assessed chronic depression and prescribed Lexapro, 10 mg. per day and told plaintiff to return in four weeks.

---

[4]The ALJ referred to this as the "second" hypothetical, but it was actually the third one posed to the vocational expert (Tr. at 53).  It was the second one posed by the ALJ, but the plaintiff's attorney had asked an intervening hypothetical.

[5]Page 389 of the transcript is a record of a patient other than plaintiff.

On April 14, 2008, plaintiff was seen by Dr. Moose (Tr. at 202). Plaintiff said the Lexapro had had zero affect on his depression "(with mild anxiety at times)." Restoril did help him sleep. "Sleeping better has helped reduce daytime fatigue." Dr. Moose observed that plaintiff was "healthy appearing" and in no acute distress. He was well dressed and well groomed and "comes across as intelligent and articulate without any overt signs of anxiety or depression." Plaintiff was assessed with chronic depression with anxiety. Dr. Moose prescribed Wellbutrin, renewed plaintiff's Restoril, and told him to return in a month.

May 13, 2008, is plaintiff's alleged onset date.

On June 17, 2008, plaintiff was seen by Dr. Moose (Tr. at 201). Plaintiff reported no benefit from Lexapro which had been tried in March, and some benefit from Wellbutrin which had been started in mid April but which caused increased incidents of migraine headaches. He reported that this month he had a three-day headache. He has never tried prescription medication for headaches since over-the-counter pain medicine and sleep usually take care of his headaches. "Recently he has missed some work because of headaches and was finally let go by Bass Pro, so he is losing his health insurance." Plaintiff reported that his insomnia was better with Restoril, 15 mg at bedtime. Plaintiff was "healthy appearing" and in no acute distress. "He is well-dressed and well-groomed and articulate with good eye contact." Plaintiff was assessed with chronic depression/anxiety with partial response to Wellbutrin. He was switched to Pristiq in the hopes that it would control his depression without causing headaches. Dr. Moose told plaintiff to return in four weeks.

April 1, 2009, is the day the ALJ determined that plaintiff's disability began. On April 6, 2009, plaintiff applied for disability benefits.

There are no medical records for the ten months preceding April 17, 2009. On April 17, 2009, plaintiff went to the emergency room at Cox Health (Tr. at 210-237). He

16

complained of depression and feeling anxious. He said he had attempted suicide in the past by overdosing on sleeping pills, hanging himself, and car wrecks, and was currently feeling suicidal. He was observed to be cooperative and alert times three. His family was with him and he was in no acute distress. Plaintiff was admitted for safety precautions and was in the hospital, treated by Mehret Gebretsadik, M.D., until his discharge on April 21, 2009.

> The patient . . . was admitted with increased depressive symptoms and suicidality in the context of a breakup with his girlfriend and also being unemployed for 10 months. The patient reports that his symptoms have been worse and progressing for the past 10 months. He was [sic] eventually felt very depressed and suicidal from his breakup with his girlfriend. He was actually entertaining to end of his life [sic]. The patient . . . currently is unemployed and lives by himself.

Plaintiff was on no medication at the time of his ER visit. Plaintiff reported occasional migraine headaches. Plaintiff said he had worked for Bass Pro for 8 years and was fired 10 months ago for missing too many days after he got the flu and also had problems with being depressed. "He has been drawing unemployment. He is looking for a job." His girl friend broke up with him three months earlier, he did not fully understand why, and she no longer wanted to have anything to do with him.

Plaintiff said he got a Bachelor of Fine Arts degree in graphic art with a minor in art history in 2006. "He is wanting to get employment that is related to what he trained for and what he is paying [h]is students loans off for." Plaintiff was observed to be well groomed and dressed in casual clothes.

> He has adequate attention span on 1 to 1. He has a mood which appears to be appropriate to his affect. He is anxious and depressed. He denies current thoughts of harming himself or others but he stated that he was having them and that is why he sought help. He is well oriented x 3 and to his current situation. He is average to above average intellect judging from his interactions and conversations based on knowledge. His thoughts are goal directed. He denies auditory or visual hallucinations. He expresses no delusional thinking. He has a normal flow of thought. His memory appears to be intact x3 although selective. He shows limited insight and obviously has somewhat impaired judgement in view of what he is doing.

Plaintiff told Tonya Jokerst-Kauffman, MSW, that he had attempted suicide three times the previous week and a total of 12 times during his life. "Patient reports that he does not want to die, he just wants to feel better. Patient stated, 'I stop before I go too far.'" Plaintiff said he was sleeping fitfully, sleeping only a few hours a night, but he said it "goes in cycles from insomnia to sleeping in excess." Plaintiff reported that alcohol and drug abuse was the reason his marriage ended, but he had been clean and sober for about ten years.

> Patient reports that finances are his biggest stress currently because he lost his job about 10 months ago. However, patient did recently break up with his girlfriend and has lost all of his friends. Patient stated that his friends just stopped calling or they graduated and moved on, but currently [he] does not have any friends at all. . . . Patient is currently unemployed and has been for the past 10 months. Patient has been trying to find a job for this entire time. Patient stated that he is trying to present his art in galleries, but it is not doing well. The patient had been receiving unemployment and now has applied for a federal extension for the unemployment. Patient is hopeful that he will be accepted to continue to receive an income. Patient was open and cooperative throughout the interview. Patient provided information when asked and provided additional information without being probed.

Plaintiff was assessed with major depressive disorder, chronic and recurrent without psychotic features, and generalized anxiety disorder. He was assessed a GAF of 30[6] on initial evaluation and 60[7] on discharge. He was given Effexor XR every day and Seroquel with Zyprexa as needed. "After evaluation of the patient's condition and his financial status, the patient reported he could not afford the Effexor and Seroquel, so we started him on Celexa and trazodone". Plaintiff attended individual and group therapy while hospitalized. "He reported he benefited [sic] from this inpatient stay. He feels much more improved at this time". His

---

[6]A global assessment of functioning of 21 to 30 means behavior is considerably influenced by delusions or hallucinations or serious impairment in communication or judgment (e.g., sometimes incoherent, acts grossly inappropriately, suicidal preoccupation) or inability to function in almost all areas (e.g., stays in bed all day; no job, home, or friends).

[7]A global assessment of functioning of 51 to 60 means moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers).

discharge mental status exam reads as follows: "The patient is alert and oriented x3. He is cooperative with good eye contact. His speech is clear and spontaneous. He has logical and goal-directed thought process. His mood is described as much improved with animated and brighter affect. The patient does not have any homicidal or suicidal thoughts at this time and denies any psychotic symptoms. He does not display any psychotic or manic signs. His cognitive functions are intact and he does have a fair-to-good insight and judgment at this time." Plaintiff was discharged with prescriptions for Celexa 20 mg daily, Trazodone 5 mg at bedtime, and Klonopin 0.5 mg a day as needed. He was told to follow up at Jordan Valley Clinic for psychiatric care and to make an appointment with one of the therapists on the list he was given.

On April 28, 2009, plaintiff met with Della Goodwin, MSW, for an initial session after having been examined by and then referred by Jonathan Boswell, a physician's assistant (Tr. at 244-247). Plaintiff reported suffering from anxiety since he was a child. He said he was able to keep it under control until about two years ago when he started having difficulty making it to work. Plaintiff's employer suggested he get some help for his depression, so he did and was placed on medication. He said it did not help him, and he was eventually fired and began receiving unemployment benefits in November 2008. "Jason has a BFA and is an artist using paints as his medium. He recently had a good response to a galary [sic] show he had in San Francisco, CA. He is trying to get into a local galary [sic]." Plaintiff married in 1998 and divorced after four years of marriage. He completed his college degree in 2006. He reported that he did not date for 8 years after his divorce; however, that would have been 2010 -- a year after the date of this medical visit. Plaintiff reported having had two significant relationships after his divorce, each lasting about seven months. Plaintiff's father and sister are both nurses. Plaintiff reported previous heavy use of alcohol and drugs but no current use of

19

either. Plaintiff's cognitive functioning was normal. His attitude was normal, his mood was euthymic. Plaintiff reported little interest in things he used to enjoy, including art and reading. He said he had very little energy and is easily distracted. Plaintiff was assessed with major depressive disorder, recurrent, severe, and social phobia. Ms. Goodwin encouraged plaintiff to apply for Medicaid and gave him a booklet on depression and anxiety.

On May 6, 2009, plaintiff returned to see Ms. Goodwin for a one-hour session (Tr. at 243). Ms. Goodwin reviewed the anxiety screening questionnaire plaintiff had been given on the previous visit, and she indicated that it confirmed her diagnosis of social phobia. Plaintiff stated that he had been unable the previous day to leave his apartment and go a block to turn in his materials at the Social Security office, so he mailed them instead. Ms. Goodwin gave plaintiff a workbook and encouraged him to journal his thoughts when he is feeling anxious.

On May 14, 2009, plaintiff saw Ms. Goodwin for a one-hour session (Tr. at 242). Plaintiff said that his anxiety had been reduced over the past week until the day before when he had an anxiety attack, but he was able to get it under control. He had been reading the workbook chapter she had given him. Ms. Goodwin counseled plaintiff and then gave him the next chapter of the workbook to read for next week's appointment.

On May 21, 2009, plaintiff saw Della Goodwin for individual outpatient counseling with a chief complaint of "depressed" (Tr. at 298, 340-341). Plaintiff was very agitated. "He shared details of how he has been dealing with creditors and applying for Social Security Disability." Plaintiff reported that he thought he had done well when he was on Effexor. Ms. Goodwin talked to plaintiff about programs for free medication. A few hours later, plaintiff saw Jonathan Boswell, a physician's assistant, for a check up (Tr. at 296-298). Plaintiff complained of fatigue, occasionally debilitating headache, heartburn, and anxiety with agoraphobia and panic attacks. "Depression deeply unhappy, constant thoughts of suicide and

frightening his counselor. Reports success on meds in the hospital which included Effexor - failed several SSRIs[8] here. Sleep disturbances, difficulty shutting his mind down." His general appearance was "alert, active, not acutely ill." His heart sounds were normal. Cognitive functioning was normal. His attitude was listed as, "Not abnormal, appears hopeful." Buspar was stopped as plaintiff reported a "reaction". He prescribed Seroquel, Pristiq, HydroOxyzine hydrochloride, Fioricet (as needed for pain, not to exceed ten per week), and Omeprazole (as needed for stomach pain). "Will link him to the patient assist program for expensive meds."

On May 28, 2009, plaintiff saw Della Goodwin for individual outpatient therapy with a chief complaint of "depressed" (Tr. at 296, 338-339).

On June 4, 2009, plaintiff saw Della Goodwin for individual outpatient therapy with a chief complaint of "anxious" (Tr. at 296, 336-337). Plaintiff had gone to a restaurant with his family over the weekend.

On June 11, 2009, plaintiff saw Della Goodwin for individual outpatient therapy with a chief complaint of "depressed" (Tr. at 295, 334-335). Plaintiff described past episodes of insomnia during which he could stay awake for 2 1/2 weeks and still not have trouble making it through the day on his job. Plaintiff had started taking Seroquel the previous night and slept all night without feeling drugged or hung over in the morning.

On June 11, 2009, Geoffrey Sutton, Ph.D., completed a Psychiatric Review Technique in connection with plaintiff's application for disability benefits (Tr. at 250-261). Dr. Sutton found that plaintiff suffered from a severe mental impairment but that it was not expected to last 12 months. His impairment stemmed from major depressive disorder and general anxiety disorder. He found that plaintiff suffered from mild restriction of activities of daily living;

---

[8]Selective serotonin re-uptake inhibitors or serotonin-specific reuptake inhibitor are a class of compounds typically used as antidepressants.

moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence or pace; and that he had had one or two episodes of decompensation, each of extended duration. In support of his findings, Dr. Sutton described plaintiff's treatment in March 2008 which improved his symptoms, and he noted that plaintiff did not return for follow up and had no mental health care until his hospitalization in April 2009. He was on no mental health medication at that time. Plaintiff had follow up for two weeks and reported improvement, and no depressive symptoms or suicidal ideation were reported. During hospitalization "he stabilized quickly and with continued treatment further improvement would be anticipated. While symptoms may continue to be more than non-severe it is anticipated that by duration of 4/10 he will be able to complete moderately complex tasks in settings with limited social contact."

That same day, Dr. Sutton completed a Mental Residual Functional Capacity Assessment (Tr. at 262-264). He found plaintiff not significantly limited in the following:

- The ability to remember locations and work-like procedures

- The ability to understand and remember very short and simple instructions

- The ability to understand and remember detailed instructions

- The ability to carry out very short and simple instructions

- The ability to maintain attention and concentration for extended periods

- The ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances

- The ability to sustain an ordinary routine without special supervision

- The ability to make simple work-related decisions

- The ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods

- The ability to ask simple questions or request assistance

- The ability to accept instructions and respond appropriately to criticism from supervisors

- The ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes

- The ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness

- The ability to respond appropriately to changes in the work setting

- The ability to be aware of normal hazards and take appropriate precautions

- The ability to travel in unfamiliar places or use public transportation

- The ability to set realistic goals or make plans independently of others

He found plaintiff moderately limited in the following:

- The ability to carry out detailed instructions

- The ability to work in coordination with or proximity to others without being distracted by them

- The ability to interact appropriately with the general public

On June 11, 2009, plaintiff's application for disability benefits was denied.

On June 18, 2009, plaintiff saw Della Goodwin for individual outpatient therapy with a chief complaint of "depressed" (Tr. at 295, 332-333). Plaintiff reported not feeling any better since starting new medication, but Ms. Goodwin indicated "it would seem that there has been significant changes." Plaintiff had been able to get out of his house more often. Plaintiff had met a new neighbor and talked with her. He reported reading books, going to a movie with his father and going out to eat with his parents. "He was denied SS disability. I encouraged him to appeal and explained how to go about finding a disability lawyer."

On June 25, 2009, plaintiff was seen by Amy Meriweather, Ph.D., a licensed psychologist, at the request of Della Goodwin (Tr. at 391-396). Ms. Meriweather was asked to

clarify plaintiff's diagnosis and goals for his treatment.

Jason arrived early for his appointment, well groomed and dressed appropriately for the situation and weather. Jason made good eye contact but was nervous as indicated by his shaking, fidgeting and expression of anxiety. Jason was oriented to place and time but was a day off on the date. He did all that was asked of him without complaint. Jason was distracted during some of the evaluation by his own bodily symptoms of anxiety. Other than that, Jason was able to concentrate and attend fairly well.

Plaintiff had a flat affect and depressed and anxious mood.

. . . He then worked for a month as a photo developer. He quit that job to join Bass Pro Outdoor World as a set designer. He remained there for seven years. However, they continued to cut his hours until he was no longer able to meet his bills, so he quit and went to work with Garage Graphics and Visual. He remained there for approximately six months. Jason left that job due to strained relationships with coworkers and disagreements about his job description. Most recently, Jason worked for Bass Pro as a[n] artist for less than a year before he was fired for missing so much work. Jason missed work due to migraine headaches and anxiety which gets so bad that he vomits. Jason also has insomnia in which he cannot fall asleep for weeks at a time. He stated that he can go to work and function during the times he has insomnia. He has a problem sleeping approximately 3-4 times a year. Jason described periods of depression which get overwhelming. He has had twelve suicide attempts in his life. . . .

. . . He has misjudged how much was in his bank account before, but is not impulsive in his spending. . . .

Dr. Meriweather conducted a clinical interview and administered the Rorschach,[9] Adult

Incomplete Sentences,[10] Wechsler Adult Intelligence Scale - III (IQ test), and Millon Clinical

---

[9]A person is shown an inkblot printed on a card and asked, "What might this be?" The responses are recorded verbatim. If a person responds to common contours of a blot, it was theorized that there was little projection going on. However, when a person starts to embellish on his answer or starts adding more information than he originally provided, it can be a sign that projection is now occurring. That is, the person is telling the examiner something about himself or his life, because he is going well beyond the features of the inkblot itself. Once a person cycles through the 10 inkblots once and tells the psychologist what he saw in each inkblot, the psychologist will then take the person through each inkblot again, asking the person who is taking the test to help the psychologist see what the patient saw in his original responses. This is where the psychologist will get into some detail to clearly understand what and where a person has seen various aspects in each inkblot.

[10]The Incomplete Sentences Test contains 60 items, consisting of the first few words of sentences which the respondent is asked to complete on the basis of one's feelings. An objective scoring mechanism is provided which yields a numerical score between 0 and 100. The test

Multiaxial Inventory - III.[11]  Plaintiff had a full scale IQ of 116 (86th percentile).  His

Performance IQ was 107 (68th percentile) and his Verbal IQ was 122 (93rd percentile).  His

Verbal Comprehension IQ was 131 (98th percentile) -- the ability to work with factual

information that is rote and presented orally.  His Perceptual Organizational IQ was 89 (23rd

percentile) -- the ability to think in a fluid fashion with information that is visual and more

ambiguous.  Dr. Meriweather assessed schizoaffective disorder depressive type, generalized

anxiety disorder with agoraphobia and social component, and bereavement (due to the death

of plaintiff's brother when plaintiff was a child).  His current GAF was 45,[12] highest in the past

year was 55.  She recommended individual cognitive behavioral therapy.  "Jason should be

encouraged strongly to do what he does not want to do.  It is important not to foster Jason's

dependency, but to help motivate him to learn to work for himself.  Once Jason is able to

tolerate more social discomfort, he is likely to benefit from the social support of peers at NAMI

[National Alliance on Mental Illness]."  Dr. Meriweather suggested plaintiff try to find a job or

volunteer position in an artists' workshop so he would be with like-minded people.

On July 16, 2009, plaintiff saw Della Goodwin for individual outpatient therapy with a

chief complaint of "depressed" (Tr. at 295, 330-331).  Plaintiff reported increased depression

and anxiety.  Plaintiff agreed to contact three art organizations to see what volunteering

opportunities would be available.  Ms. Goodwin observed that plaintiff's affect was flat and his

---

measures job commitment, communication skills, interpersonal skills, positive attitude,
problem solving ability, and self confidence.

[11]This test is composed of 175 true-false questions and usually takes the average person less
than 30 minutes to complete. After the test is scored, it produces 29 scales -- 24 personality
and clinical scales, and 5 scales used to verify how the person approached and took the test.

[12]A global assessment of functioning of 41 to 50 means serious symptoms (e.g., suicidal
ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social,
occupational, or school functioning (e.g., no friends, unable to keep a job).

mood was severely depressed.

On July 24, 2009, plaintiff saw Jonathan Boswell, a physician's assistant, for a follow up on depression and anxiety (Tr. at 293-294). Plaintiff was smoking, not eating a "nutritious and satisfying diet" and not exercising regularly. Mr. Boswell prescribed Pristiq (for depression), HydroOxyzine hydrochloride (for anxiety), and Lorazepam (for anxiety). That same day, plaintiff saw Della Goodwin for individual outpatient therapy with a chief complaint of "social phobia" (Tr. at 294, 328-329). Plaintiff reported having had an anxiety attack associated with going to see his disability lawyer. Plaintiff had begun reconnecting with high school friends on three social networking sites.

On July 31, 2009, plaintiff saw Della Goodwin for individual outpatient therapy with a chief complaint of "some improvement" (Tr. at 293, 327). Plaintiff stated that he disagreed with a psychological evaluation he had the day before because he had never had a psychotic episode. It is unclear what evaluation plaintiff was referring to, as there is no medical record before the court dated July 30, 2009, nor is there any record referring to a psychotic episode. "He reported the lorazepam worked very well for him and he has only had to take it one time. He attributes the increase in the Pristiq for his improved mood." Plaintiff had gone to a book store and he interacted with others on the internet. Plaintiff said he was researching volunteer opportunities at various art organizations. Ms. Goodwin encouraged him to apply for Vocational Rehabilitation services. Plaintiff "looked significantly better today, full range of affect and elevated mood."

On August 3, 2009, plaintiff saw Della Goodwin for individual outpatient therapy with a chief complaint of "social anxiety" (Tr. at 293, 325-326). Plaintiff reported a significant improvement in depression and anxiety symptoms since medication changes two weeks earlier. "He smiled saying, 'I even had one day when I felt totally normal!' He reports fewer suicidal

thoughts, generally now in passing, decreased sadness and more of an even mood. He states he has had 3 anxiety attacks in the past two weeks, fairly mild and taken care of with medication. He states he has had no anxiety going to stores or doing tasks in public, as long as he doesn't have to really interact with anyone." He had not been able to go to an art group to volunteer because the thought of interacting with people made him anxious. Plaintiff went to Barnes and Nobel to look for a book club to join. Ms. Goodwin encouraged him to get in touch with NAMI and attend a depression/anxiety group.

On August 20, 2009, plaintiff saw Della Goodwin for individual outpatient therapy with a chief complaint of "anxious" (Tr. at 293, 323-324). Plaintiff had been able to go to a movie by himself. He finished reading a "10 book series". Plaintiff did not find a book club, and Ms. Goodwin suggested he start one. "He liked the idea and will think about it." Plaintiff got an email from his former girl friend and responded. "He . . . wonders where this may lead. I suggested he take it one day at a time and not go down any path in his mind. He laughed."

On September 14, 2009, plaintiff saw Della Goodwin for individual outpatient therapy with a chief complaint of "anxious" (Tr. at 292, 321-322). Plaintiff reported not doing well. "He stated he has increased anxiety and tension and panic attacks over the course of the past two and 1/2 weeks. He reported it just sort of snuck up on him to the point that he can not leave his apartment, while not feeling safe in his apartment."

On September 21, 2009, plaintiff saw Jonathan Boswell, a physician's assistant, complaining of anxiety, depression, pain, and problems sleeping (Tr. at 291-292). He reported feeling tired, sleeping poorly, muscle cramps, anxiety, agoraphobia, and "nervous now even around the house." Plaintiff said "no depression, believes Pristiq is helping with that." His appearance was noted as "chronically ill, alert, active". His cognitive functioning was normal, his mood was euthymic, his thought processes were not impaired. Mr. Boswell

prescribed Seroquel (for bipolar disorder), Haldol (treats schizophrenia), Trazodone (antidepressant used to treat insomnia), Cyclobenzaprine (muscle relaxer), and Diltiazem (for high blood pressure).

On September 22, 2009, plaintiff saw Della Goodwin for individual outpatient counseling with a chief complaint of "depressed" (Tr. at 290-291, 319-320). Plaintiff completed two bipolar screenings which "indicated that he has Bipolar Disorder." Plaintiff said that he had thought his neighbors were watching him, "so he kept his curtains closed and didn't take his garbage out for a couple of days. Just as quickly as those paranoid thoughts came they also went away. He can laugh at those thoughts today." Plaintiff reported having slept well the night before after taking the medication.

On September 29, 2009, plaintiff saw Della Goodwin for individual outpatient counseling with a chief complaint of "depressed" (Tr. at 290, 317-318). Plaintiff reported taking his medication minutes before going to bed and then not falling asleep for 3 or 4 hours. Ms. Goodwin suggested he take his medication 3 to 4 hours before he wanted to go to bed. She gave him information on healthy sleep habits. "He laughed because he does so many of the things the sheet said not to do." Plaintiff reported that journaling his thoughts and feelings was very helpful.

On October 9, 2009, plaintiff saw Della Goodwin for individual outpatient counseling with a chief complaint of "manic episode" (Tr. at 290, 315-316). Plaintiff reported he was agitated, restless, unable to sleep and unable to concentrate or stay focused.

On October 15, 2009, plaintiff saw Jonathan Boswell, a physician's assistant, complaining of lack of sleep, "2 hrs of sleep for the past 2 weeks, depression 'has hit a wall', medication not working" (Tr. at 289-290). Mr. Boswell prescribed Baclofen as needed for muscle spasm, Doxycyline (antibiotic), Diltiazem (for high blood pressure), and

Cyclobenzaprine (muscle relaxer). The Ambien (tranquilizer) was stopped.

On October 16, 2009, plaintiff saw Della Goodwin for family education (Tr. at 289, 313-314). Plaintiff's parents and sister attended as well. "Jason's sister was trying to understand how a 33-year old, who up until recently, had been having a 'normal' life, could all of a sudden be diagnosed with Bipolar Disorder. . . . At one point [she] accused Jason of 'faking it'."

On October 23, 2009, plaintiff saw Della Goodwin for individual outpatient counseling (Tr. at 288, 311-312). His chief complaint was "depressed". Plaintiff reported having spent most of the preceding week in bed due to depression. However, "last night he forced himself to go visit his brother-in-law while his sister was at work and they had a good time." Plaintiff applied for two part-time jobs, both at large book stores. One was a research job; one was a cashier's job. Ms. Goodwin observed that plaintiff looked rested, he denied any anxiety attacks over he past week, he reported that Ativan had been very helpful. He sounded more self-confident, his thinking was linear and goal directed. Ms. Goodwin recommended plaintiff attend NAMI's Procovery Group. "He agreed he would feel comfortable doing that."

On October 30, 2009, plaintiff saw Della Goodwin for individual outpatient counseling with a chief complaint of "depressed" (Tr. at 288, 309-310). Plaintiff reported having a good week with no crying or anxiety attacks. "He did not follow-up with his two job applications. . . . He did not go to NAMI. His parents lent him the money to pay his rent because he had so many over drafts his bank wouldn't allow him to cash the rent check - he has to deposit it to pay the overdrafts and then of course he didn't have enough to pay the rent. His parents gave him another rent check." Plaintiff "presented with good hygiene. He had good eye contact. He looked rested. He said he simply didn't have the motivation to do any of the things he had agreed to do at our last session." However, he indicated he was thinking about finding

someone to date because he wanted a sexual relationship. "We discussed networking both for jobs and getting together with people." Plaintiff agreed to invite a friend to go to the park, and he agreed to walk every day since the weather was expected to be nice.

On November 11, 2009, plaintiff saw Jonathan Boswell, a physician's assistant, for a follow up on depression and anxiety (Tr. at 287-288). Plaintiff reported feeling tired and sleeping poorly. He reported occasional discomfort from shooting pains in his left upper chest. He reported a history of cardiomyopathy for which ablation[13] was recommended two years ago. Plaintiff had had painful family contacts recently and his anxiety had been getting intense. "No depression." Mr. Boswell observed that plaintiff was "well appearing, alert, not acutely ill." He prescribed Ambien for sleep, Lorazepam for anxiety, and Diltiazem for high blood pressure and chest pain.

On November 13, 2009, plaintiff saw Della Goodwin for individual outpatient counseling (Tr. at 287, 307-308). His chief complaint was "depressed". Plaintiff "called about the Border's Book Store job" and had a couple of college friends get in touch with him. Plaintiff was fully oriented, he reported thinking about a suicide attempt but did not act on it, he was not suicidal on this day, his mood was depressed. Plaintiff agreed to go to a Procovery Group at NAMI and to invite of the his college friends to go to "Close Garden" on Sunday.

On November 30, 2009, plaintiff saw Della Goodwin for individual outpatient counseling with a chief complaint of "depressed" (Tr. at 286, 305-306). Plaintiff was "very happy" with the changes the medication has had on him. Plaintiff had been blogging on his

---

[13]Cardiac ablation is a procedure that can correct heart rhythm problems (arrhythmias). Ablation typically uses catheters -- long, flexible tubes inserted through a vein in the groin and threaded to the heart -- to correct structural problems in the heart that cause an arrhythmia. Cardiac ablation works by scarring or destroying tissue in the heart that triggers an abnormal heart rhythm. In some cases, ablation prevents abnormal electrical signals from traveling through the heart and thus stops the arrhythmia.

Facebook and had received encouraging and positive responses. "He has also decided that he does not think it is wise of him to try to get a part-time job at this point because he is aware that he is sensitive to even everyday normal stresses. He has unemployment for the next six months and is going to focus on healing. He is planning to start the Procovery Group at NAMI this Saturday." Plaintiff's affect was "brighter today." Plaintiff was sleeping a lot and feeling fatigued, but he was less depressed, he was no longer crying, he did not feel hopeless, he was not having ruminating thoughts. "He reports he is taking his medications as prescribed." Plaintiff agreed to start a walking program.

On December 3, 2009, plaintiff saw Harcharan Bains, M.D., for a psychiatric follow up[14] (Tr. at 367-368). He reported continued anxiety but said his depression was more under control. He denied mood swings, crying episodes or anger outbursts. "He is going to therapy weekly which he feels is helpful. Sleep and appetite are good." Dr. Bains increased plaintiff's Xanax and Abilify and told him to continue his other medications and return in four weeks.

On December 8, 2009, plaintiff saw Della Goodwin for individual outpatient counseling with a chief complaint of "sad" (Tr. at 286, 303-304). Plaintiff was sad after finding out his family was not going to celebrate Christmas together. Plaintiff was blogging and getting supportive responses. "He spoke about his growing friendships with people at the local gas station. Finds he is going there every day." Plaintiff's affect was a bit sad, his thinking was linear and goal directed. "I again encouraged him to attend NAMI's Procovery Group."

On December 15, 2009, plaintiff saw Della Goodwin for individual outpatient counseling with a chief complaint of "depressed" (Tr. at 285-286, 301-302). Plaintiff reported a couple days of no sleep and then going into a depression. "He stated he had

---

[14]This is the earliest record of Dr. Bains; therefore, the psychiatric follow-up reference seems to mean that this is not plaintiff's first treatment appointment for psychiatric symptoms.

intended to go to NAMI's Procovery Group, but didn't make it, due to over sleeping." Plaintiff had been taking walks around his apartment complex which he enjoyed. "His unemployment has finally been straightened out, but he thinks the financial stress the delay caused contributed to his depressed mood. . . . He has continued to blog and get positive feedback and interest in his site." Plaintiff's affect was a bit constructed, although towards the end of the session he was smiling and his thought process was goal directed. His mood was depressed. He was fully oriented with intact memory. Plaintiff talked about a friend he had reconnected with on Facebook and whom he was planning to visit over Christmas. "He was excited, except about the cost of driving to Sikeston." They talked about how he could meet people, and plaintiff thought "any of the coffee houses" would be something he could do. Plaintiff agreed to go to a coffee house for an hour once a week to read.

On December 17, 2009, plaintiff saw Dr. Bains for a psychiatric follow up (Tr. at 365-366). Plaintiff had called two days earlier reporting slurred speech and psychomotor retardation. He was told to stop the Seroquel and the side effects ceased. Plaintiff reported that his depression was controlled but he continued to have high anxiety. "He is going to therapy weekly which he feels is helpful." Dr. Bains told plaintiff to stop taking Seroquel and start taking Remeron. He was to continue his other medications.

On December 22, 2009, plaintiff saw Della Goodwin for individual outpatient counseling (Tr. at 285, 299-300). Plaintiff reported sleeping more in the day than at night. "He continues to blog, got his first criticism, . . . but was not disheartened by it and was able to respond without being defensive." Plaintiff's affect was bright. His mood was euthymic. His thoughts were goal directed. He was fully oriented with intact memory. "He reports taking his medication as prescribed and feeling good about himself."

On January 19, 2010, Michael Murrell, Psy. D., completed a psychological evaluation (Tr. at 272-279). Dr. Murrell met with plaintiff on January 14, 18 and 19. He performed a clinical interview, a mental status exam, a psychosocial history, a symptom checklist, and a review of medical records from a psychological evaluation done by Amy Meriwether, Ph.D., on June 25, 2009. He administered the Beck Depression Inventory,[15] Incomplete Sentences Adult Form, Minnesota Multiphasic Personality Inventory-2,[16] and Thematic Apperception Test.[17]

Plaintiff reported that he had spurts of energy for several days and that they have lasted as long as two weeks. He said that an infant brother and his maternal grandparents died when plaintiff was seven years old, and that was a very traumatic loss for him. He reported that he was sexually abused by a teenaged male cousin but that his mother did not believe him when

---

[15]The BDI is a 21 item self-report rating inventory measuring characteristic attitudes and symptoms of depression.

[16]The MMPI-2 is used by mental health professionals to assess and diagnose mental illness. The MMPI-2 contains 567 true/false questions and takes approximately 60 to 90 minutes to complete. The MMPI-2 is designed with 10 clinical scales which assess 10 major categories of abnormal human behavior, and four validity scales, which assess the person's general test-taking attitude and whether he answered the items on the test in a truthful and accurate manner.

[17]The Thematic Apperception Test, or TAT, is a projective measure intended to evaluate a person's patterns of thought, attitudes, observational capacity, and emotional responses to ambiguous test materials. In the case of the TAT, the ambiguous materials consist of a set of cards that portray human figures in a variety of settings and situations. The subject is asked to tell the examiner a story about each card that includes the following elements: the event shown in the picture; what has led up to it; what the characters in the picture are feeling and thinking; and the outcome of the event. Because the TAT is an example of a projective instrument -- that is, it asks the subject to project his or her habitual patterns of thought and emotional responses onto the pictures on the cards -- many psychologists prefer not to call it a "test," because it implies that there are "right" and "wrong" answers to the questions. They consider the term "technique" to be a more accurate description of the TAT and other projective assessments. It is considered to be effective in eliciting information about a person's view of the world and his or her attitudes toward the self and others. As people taking the TAT proceed through the various story cards and tell stories about the pictures, they reveal their expectations of relationships with peers, parents or other authority figures, subordinates, and possible romantic partners.

he told her.

Plaintiff was taking Pristiq, Abilify, Depakote, Xanax, Hydroxyzine (as needed), Ambien, Remeron, Baclofen, Fioricet (as needed), Diltiazem, Lopid, and Tylenol (as needed). He reported suffering from nausea, vomiting, insomnia, tachycardia, and migraines.[18] Plaintiff said that in addition to his 13 past suicide attempts, he had developed panic disorder and agoraphobia during the past year. He reported sleepless and manic episodes for as long as 14 days at a time. Plaintiff stated that he was able to succeed as a college student in part because of his history of substance dependency. Plaintiff used marijuana, LSD, hallucinogenics, and alcohol from age 19 to 22 but had not used those substances since then. He continued to smoke.

Plaintiff said he was in bed from about 10 pm to 10 am but woke up four to five times a night. His hobbies included watching television, reading, and playing with his two cats. Plaintiff said he got his bachelor's degree in 2006 and then worked at Bass Pro Shop from June 2007 to June 2008. "He disclosed that he was fired due to missing too many days of work because of his problems with social anxiety." Plaintiff worked as a photographer from March 2007 to June 2007 and was fired because business decreased. He worked for Garage Door Graphics Company from October 2006 to March 2007 and quit that job because he took the job at Bass Pro.

> His appearance was neat and clean; his facial expressions were appropriate and eye contact was excellent. His personal hygiene was excellent. He was cooperative and related well with the examiner. His affective responses appeared to be congruent. His speech was relevant and goal directed. He appeared to experiencing [sic] a somewhat depressed mood. He was oriented to time, place, person, and purpose. The client did not appear to be psychotic as there was no evidence of loose or bizarre association or

---

[18]It is unclear whether this was intended to be a list of side effects. I predict not, as plaintiff's tachycardia is a condition, SVT, from which he suffers independently of any of this medication.

unusual gestures. He expressed suicidal ideation without a plan occurring within the past three weeks. The quality of the claimant's thinking appeared to be adequate. . . . His abstract reasoning appeared to be intact. . . . His short-term memory was adequate. . . . His intellectual functioning appeared to be in the high average range. . . . His mathematical skills appeared to be intact. . . . His social judgment skills were intact. . . . He appeared to have considerable insight into the nature of his condition and he did appear [to] project blame for his shortcomings onto others. . . .

Minnesota Multiphasic Personality Inventory-2 (MMPI-2):
. . . Individuals with similar scores to the claimant's may report moderate anxiety, and their problems may not be acute or incapacitating. Most of their difficulties tend to stem from deep, chronic feelings of anger or hostility towards their family members. These feelings towards family members are not usually expressed, and may not be recognized by the individual as hostile.

Beck Depression Inventory:
. . . is a 21-item self-report . . . . His score indicated that he was suffering what the test would indicate as "extreme depression." . . .

Symptom Checklist-90-R:
. . . He noted that he had been suffering from severe migraine headaches since childhood and that they occurred approximately three times per month. He also indicates that he had chest pains as well as tachycardia and that they had been a long standing problem for him. . . . He noted that since he had been taking Xanax that his short term memory also seemed to be much worse as well as his increasingly poor ability to concentrate. . . .

Medical Report from 6-25-09 Psychological Evaluation by Amy Meriwether, Ph.D.:
In this report, Dr. Meriwether noted that the claimant's overall Full Scale Intelligence Quotient was 116. . . . His Verbal Comprehension IQ of 131 which placed him in the 98th percentile was a particularly impressive finding. It should be noted that the evaluation done on 6-25-09 found that Mr. Torgerson had difficulty with his processing speed. She found that his scores placed him only in the 10[th] percentile. This finding suggests that the claimant has good intellectual ability but that perhaps the effect of his depression has dramatically reduced his ability to concentrate and perform necessary intellectual functions. . . .

Ability to Attend to Task:
The client was observed to complete the test in a period of approximately 90 minutes. He did not complain about loss of concentration, so it could be concluded that he was able to maintain his concentration for that period of time.

* * * * *

Summary and Recommendations:
This claimant appeared to be very depressed yet remarkably cooperative. He was quite lucid and verbal in the interview. This was surprising given his reported 13 attempts at

suicide. . . . The episode that Mr. Torgerson reported that he was sexually abused at age seven and that his mother had totally dismissed his feelings by saying "You just made that up" was a significant event that needs to be explored in individual as well as family therapy.

. . . [I]t would be helpful for him to be in family therapy with his family of origin to develop the ability of the family to communicate with one another as well as resolve conflict of long standing. A family therapist will need to see them once per week for a minimum of 12 weeks.

Mr. Torgerson has the symptoms of Bipolar Disorder II as evidenced by the periods of time that he feels deeply depressed (his Beck Depression Score indicated "Extreme Depression") and his infrequent periods of mania. He reportedly has been awake for several days at a time during which he found that he had impulsively spent money that he did not have or on occasion been on a drinking spree that ended in self-loathing thoughts and led to more symptoms of depression. . . .

Although the claimant stated that he no longer used alcohol or street drugs it would be well for him to be in a group therapy situation in which alternative coping skills were discussed and encouraged. In addition, Mr. Torgerson needs to be in . . . intensive individual psychotherapy at least two days per week. . . . He might also benefit from such small group activities as those offered by A.A. or Al. Anon for a very period [sic] of time. . . .

Mr. Torgerson is in crisis and his prognosis is guarded at this time. . . . He will need a minimum of one year of individual therapy for sessions at least once and preferably twice, per week.

Two days later, on January 21, 2010, Dr. Murrell completed a Medical Source

Statement - Mental (Tr. at 281-282). He found that plaintiff was not significantly limited in

the following:

- The ability to remember locations and work-like procedures

- The ability to understand and remember very short and simple instructions

- The ability to carry out very short and simple instructions

- The ability to interact appropriately with the general public

- The ability to ask simple questions or request assistance

He found that plaintiff was moderately limited in the following:

- The ability to understand and remember detailed instructions

- The ability to carry out detailed instructions

- The ability to sustain an ordinary routine without special supervision

- The ability to respond appropriately to changes in the work setting

- The ability to be aware of normal hazards and take appropriate precautions

- The ability to travel in unfamiliar places or use public transportation

He found that plaintiff was markedly limited in the following:

- The ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances

- The ability to work in coordination with or proximity to others without being distracted by them

- The ability to make simple work-related decisions

- The ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes

- The ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness
- The ability to set realistic goals or make plans independently of others

He found that plaintiff was extremely limited in the following:

- The ability to maintain attention and concentration for extended periods

- The ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods

- The ability to accept instructions and respond appropriately to criticism from supervisors

On January 28, 2010, plaintiff saw Dr. Bains for a psychiatric follow up (Tr. at 362-364). "Last visit his Seroquel was discontinued and he was started on Remeron. He has not been taking his Ambien and Remeron correctly and was taking more than he was supposed to be due to misunderstanding the directions. His anxiety is in control with his meds but his depression has increased. He has been having suicidal thoughts with plans to shoot himself,

put a bag over his head and hang himself with wire." Plaintiff reported that those were just thoughts, he was not planning to "do it." Plaintiff had not been getting along with his family. He said he had been seen by Dr. Murrell for a psychological evaluation due to his parents requesting a second opinion. He denied mood swings and anger outbursts, but reported crying at times. He was having problems with sleep. Dr. Bains increased plaintiff's Remeron to 15 mg at bedtime and increased his Pristiq to 150 mg in the morning. "Instructed patient to take his medications as they are ordered."

On January 29, 2010, plaintiff saw Jonathan Boswell, a physician's assistant, to follow up on "heart problems" and lipids (Tr. at 284-285). Plaintiff continued to have palpitations and an ablation was recommended. "Depression almost went inpatient yesterday; still having suicidal thoughts. His psychiatrist wants to increase the Pristiq to 150 mg QD [every day]. A desire to continue living." Plaintiff continued to smoke a pack of cigarettes per day. On exam plaintiff's heart rate and rhythm were normal with normal heart sounds. His thought processes were "not impaired." Cognitive function was normal.

On February 11, 2010, plaintiff saw Dr. Bains for a psychiatric follow up (Tr. at 359-361). Plaintiff said he thought he was swinging into mania. He had been unable to sleep and was experiencing increased anxiety. He had two panic attacks a couple days earlier. He denied depression, no anger outbursts, only one crying episode. Dr. Bains increased plaintiff's Depakote from 500 mg to 1,000 mg at bedtime. "Instructed patient to take his medications as they are ordered."

On February 24, 2010, plaintiff saw Dr. Bains for a psychiatric follow up (Tr. at 357-358). Plaintiff reported improvement in both his depression and mania since the increase in Depakote. Plaintiff reported continuing to struggle with anxiety and panic attacks -- "waking up in the middle of the night with panic attacks. . . . Appears to be in good mood." Dr. Bains

discontinued Xanax and started Klonopin 1 mg three times per day. He told plaintiff to return in two weeks.

On March 10, 2010, plaintiff saw Dr. Bains for a psychiatric follow up (Tr. at 354-356). Plaintiff reported a "big improvement" in anxiety since Klonopin was started in place of Xanax. He had had no panic attacks since his last visit two weeks earlier. His depression had increased the past few days, he reported a couple crying episodes, and he started feeling more hopeless and worthless. He continued to wake up for 1 to 2 hours each night. Dr. Bains increased plaintiff's Remeron from 15 mg to 30 mg at bedtime and told him to return in three weeks.

On April 1, 2010, plaintiff saw Dr. Bains for a psychiatric follow up (Tr. at 351-353). Plaintiff reported better sleep since his Remeron was increased. "Anxiety continues to be a problem; Klonopin is effective but he feels it needs to be increased. Panic attacks related to being in public. Depression is improved; he states it 'comes and goes'; no crying spells. No mania reported." Dr. Bains continued plaintiff on the same medications at the same dosage and told him to use the Klonopin "as needed" for anxiety. He told him to return in two months.

On May 11, 2010, plaintiff saw Victoria Incrivaglia for outpatient therapy (Tr. at 347-349). Plaintiff reported that he can no longer work or do other "normal" activities due to bipolar disorder and severe anxiety disorder. His GAF was assessed at 70.[19] Plaintiff was well oriented in all spheres, he was alert, his affect was appropriate, mood was euthymic. He was neatly dressed and well groomed. Eye contact was good, speech was logical, coherent and

---

[19] A global assessment of functioning of 61 to 70 means some mild symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships.

goal-directed. Recent memory was unimpaired. Remote memory was unimpaired. Psychomotor activity was normal. There was a negligible degree of conceptual disorganization evident. This thought content was characterized by "no significant preoccupations." No hallucinations were alleged or evident. Attitude was cooperative and interested. Insight and judgment were good. Attention and concentration were normal. Impulse control was normal.

On May 17, 2010, plaintiff saw Victoria Incrivaglia for outpatient therapy (Tr. at 345-346). Plaintiff reported that he does not eat alone in a restaurant but will go through a drive-through. "He believes that everyone is looking at him or checking on in his regardless of what he is doing, i.e., taking out the trash, going out to eat." Plaintiff's motivation was listed as "fair." He acknowledged that conflictual issues exist but "seems reluctant to work on them." He was noted to have a moderate degree of compliance with treatment. He was dressed appropriately. "The client expressed his concern regarding his unemployment benefits and that he has received an extension on it. He has expressed his concern regarding the future of these benefits. He applied for disability more than one year ago, but he has not heard anything positive yet. . . . It is his belief system that says since he is uncomfortable around others then he has a disability and cannot work. . . . The client came in reporting that he was diagnosed as bi-polar; however, I am uncertain if that is the correct diagnosis for him. It seems that the client has a belief system that he is unable to work as well as the fact that he does not need to change anything in his life choices. He seems to assume that there will be disability benefits available for him; he does not talk in terms that he can change his distortions and can learn to handle job stress and conflicts."

On May 26, 2010, plaintiff saw Dr. Bains for a psychiatric follow up (Tr. at 407-409). On the last visit plaintiff had been told to take Klonopin as needed. "He states that he is doing 'better' and feels his depression has decreased." Plaintiff reported increased anxiety but said he

was hoping it would be more manageable since he had started cognitive behavioral therapy. Dr. Bains increased plaintiff's Ambien dosage due to reports of problems sleeping. His other medications were continued unchanged.

May 31, 2010, is the day the ALJ determined plaintiff's disability ended.

On June 7, 2010, plaintiff saw Victoria Incrivaglia for outpatient therapy (Tr. at 343-344). Plaintiff expressed jealously over his ex-wife's success. Plaintiff went out to eat alone six times in one week even thought it was uncomfortable the first few times. Plaintiff's motivation was listed as "fair". He was able to focus on relevant topics, he was active and verbal in the sessions, and he seemed reluctant to work on issues. "Moderate degree of compliance with treatment." Plaintiff was observed to be dressed appropriately. He "stated that he continues to sleep late in the morning and some days that he does not get out of bed because he feels that he is in pain and that he does not feel like getting up. On rainy days, such as today, he wanted to stay in bed. Jason acknowledged that he does not go to bed until really late, many times after midnight; consequently, he does not 'feel' like getting up in the morning. It seems like Jason is capable of changing behaviors in his life, but at this point he has little motivation for those changes. There is also the financial issue for Jason. The assignment was to try to eat alone in a fast-food facility that would not be expensive. Jason decided to eat at a facility 6 times in one week at a location that was above fast-food. This issue becomes a reality of his stating that he has limited finances and yet his choices included eating out 6 times in one week."

On June 10, 2010, plaintiff saw Dr. Bains for a psychiatric follow up (Tr. at 403-405). Plaintiff reported being anxious because he got two tickets on the way to the clinic. "Anxiety is controlled with Klonopin." Plaintiff reported suicidal thoughts but denied plan. Dr. Bains increased plaintiff's Abilify from 5 mg to 10 mg and started Synthroid. His other medications were continued.

On June 24, 2010, plaintiff saw Dr. Bains for a psychiatric follow up (Tr. at 400-402). Plaintiff reported increased energy and motivation along with improved depression. Plaintiff reported some anxiety. "He is trying to find a job without success." Dr. Bains told plaintiff to take his Klonopin if he feels anxious.

On July 7, 2010, plaintiff saw Della Goodwin for group therapy (Tr. at 387-388). The reported changes were, "Out of unemployment, no job, family can no longer help financially." Plaintiff was "very forthcoming" in talking to the members of the group. "He spoke about his fears associated with being unemployed, out of unemployment and unable to work. He inquired about others in the group providing feedback and answering their questions."

On July 13, 2010, plaintiff saw Della Goodwin for group therapy (Tr. at 385-386). She noted no change in his mental status. Plaintiff was "very verbal today and interactive." He openly shared about his drug use and how it negatively impacted him, his art work, his reading and watching movies.

On July 15, 2010, plaintiff saw Dr. Bains for a psychiatric follow up (Tr. at 398-399). "Last visit no meds were changed. Pt reports he is doing well on his medications. No medication s/e [side effects]. Reports his depression and mood swings have improved significantly, able to get out of his bed since he is on synthroid. Sleep and appt [appetite] is good. Anxiety and panic attacks are in control." Plaintiff reported that his group therapy was helping. He denied suicidal or homicidal ideation, he had no psychosis, no involuntary movements, and his mood was euthymic. He was continued on his same medications and told to return in two months.

On July 20, 2010, plaintiff saw Della Goodwin for group therapy (Tr. at 383-384). Ms. Goodwin observed that plaintiff's affect was flat. She told plaintiff about Congress reinstating unemployment benefit extensions and talked to him about public housing. Others

in the group lived in public housing and encouraged him to look into it.

On August 3, 2010, plaintiff saw Della Goodwin for group therapy (Tr. at 381-382). Ms. Goodwin observed that plaintiff had a "severe depressed mood." Plaintiff said he was "very concerned about having to return to his parent's home who are not supportive." Plaintiff's hygiene was poor and his clothes were sweaty. Plaintiff said that he was "increasingly depressed because of his financial distress." Ms. Goodwin told plaintiff about the federal extension of unemployment and gave him information about Transition's housing programs.

On August 10, 2010, plaintiff saw Della Goodwin for group therapy (Tr. at 379-380). Plaintiff talked about the prospects of having to live with his parents. "Jason looked significantly better this week, presenting with good hygiene and clean clothes. He talked about his pleasure in reading". Plaintiff shared with the group his need of housing and a group member recommended public housing.

On August 17, 2010, plaintiff saw Della Goodwin for group therapy (Tr. at 377-378). She noted no change in his mental status. Plaintiff said he was having trouble sleeping at night but was sleeping during the day. "He is hoping the new psychiatrist will help him with this problem because he feels like he needs to get a job and has to be awake during the day to go for interviews if called. Right now he doesn't think he could do that."

On September 7, 2010, plaintiff saw Della Goodwin for group therapy (Tr. at 375-376). She noted no change in his mental status. Plaintiff mentioned losing a job he had had for three days.

On September 14, 2010, plaintiff saw Della Goodwin for group therapy (Tr. at 373-374). This was the group's last session.

On September 29, 2010, plaintiff saw Della Goodwin for individual therapy (Tr. at 370-372). "He reported being very anxious about his Disability hearing which has been scheduled for November 9th at 12:30 pm. His parents have told him that if he doesn't receive disability he cannot come home to live with them and if he didn't have anywhere else to live he would have to go to his grandmother's in KC. Jason is very fearful of having to live in KC and with his grandmother because she is so mean." Plaintiff talked about losing his last job after three days. "He thinks it was because of his medications that might have shown up in his drug screen he had to take." Plaintiff reported having applied for a community support specialist through Transitions, "as well as their housing programs. I encouraged him to complete a Public Housing application through HAS." Ms. Goodwin observed that plaintiff's appearance was appropriate, he was oriented times four, his behavior was normal, his psychomotor behaviors were normal, speech was appropriate, affect was constricted, mood was anxious and depressed, memory was intact, intellect was bright, attitude was cooperative, attention was normal, reasoning was fair, impulse control was fair, judgment was fair, insight was fair, thought content was normal, and he had no suicidal or homicidal ideation. Plaintiff agreed to reschedule in two weeks.

The following evidence was submitted only to the Appeals Council:

On October 19, 2010, plaintiff saw Della Goodwin for individual therapy (Tr. at 455-457). Plaintiff reported that his psychiatrist started him on Restoril and Klonopin due to a manic episode and agitation (those records have not been provided to the court). "He states he is now able to sleep and feels rested when he wakes up. He also spoke about being called up for jury duty which created a great deal of stress." Plaintiff's hygiene was normal and he looked rested although he seemed unsteady on his feet. He said he did not feel unsteady. His affect was appropriate and congruent, his mood stabilized. His concern over being called for

jury duty was a fear that it would be a "major criminal trial" and would leave him with unpleasant images in his mind. Plaintiff said he had written a letter and was excused from jury duty. "He is hoping that he will get to stay in his current apartment, which is why he hasn't applied for public housing. I again stressed the amount of time it may take to get housing through Transitions (even if they can keep him where he is), how long it will take to get any money from Social Security even if he wins his appeal and the benefits of being approved for Public Housing as a back-up plan. He agreed to call them and request an application be mailed to him." Stressors consisted of "change in medication, called up for jury duty."

On November 3, 2010, plaintiff saw Della Goodwin for individual therapy (Tr. at 452-454). "Jason stated that he has come to realize that he actually enjoys being alone." Plaintiff's affect was bright, his mood was euthymic, he appeared rested and well groomed. He was insightful and his thought process was intact and goal directed. He was fully oriented with intact memory. He was taking his medication as prescribed. They discussed how plaintiff's parents are in denial about plaintiff's mental illness. Plaintiff agreed to call Ms. Goodwin after his SSDI appeal hearing to let her know the outcome. She listed his stressors as "change in medications, SS Disability appeal hearing next week".

On December 6, 2010, plaintiff saw Della Goodwin for individual therapy (Tr. at 449-451). "Jason shared the details of his SSDI appeal hearing on November 9th. As of today he still hasn't heard the ruling. He has been very anxious and depressed, not sleeping and out of his Klonopin 5 days early. He spoke about having an anxiety attack in the middle of the hearing." Plaintiff had gone out to lunch the day before with his sister and brother-in-law and he went out to dinner with two friends. Plaintiff said his psychiatrist had added Cymbalta to his medication regimen; however, there is no record of anything having been added by his

psychiatrist, and in fact the last visit with his psychiatrist had occurred five months earlier. They discussed plaintiff's fear of not receiving benefits and having to live in Kansas City with his grandmother. Ms. Goodwin noted that plaintiff's stressors consisted of "SSDI appeal hearing no ruling."

On December 21, 2010, plaintiff saw Della Goodwin (Tr. at 443-448). "Jason is a self-referral and a former patient of this reporter." Plaintiff reported that he felt abandoned by his family because "come January 1st they will no longer support him financially. He still has not heard from the Social Security Administration about his disability appeal ruling. Jason has been unemployed since November 2008. He is no loner eligible for unemployment. He found one job where he worked three days before he was let go. He has been unsuccessful in finding another job. His parents have told him he would have to move to Kansas City to live with his grandmother if he doesn't have a source of income by January 1st, as they will no longer support him financially. He is frightened to move to Kansas City and doesn't like his grandmother enough to be able to live with her." Plaintiff's case worker had told him that he would not be eligible for housing through Transitions except with a roommate and he did not think he could live with a roommate. "I spoke with Jason about the reality of his situation and that his choice may very well be living with his grandmother in KC or living with a roommate in Transition's semi-independent program." Plaintiff claimed that he had a "difficult time getting his medications to stabilize his mood for very long and then it needs to be changed again." He had been experiencing anxiety attacks again, and he said that was getting worse the closer he got to January 1. Ms. Goodwin observed that plaintiff's hygiene was somewhat deficient. He was fully oriented, his psychomotor behaviors were normal, memory was intact, intellect was bright, attitude was cooperative, discouraged and hopeless. He had normal attention and insight. His thought processes were logical, thought content was unremarkable.

46

His mood was depressed, affect was flat, and behavior was limp. Reasoning was poor. "Jason has agreed to re-consider the Transition's housing program. He has also agreed to apply for Vocational Rehabilitation".

On January 12, 2011, plaintiff saw Della Goodwin for individual therapy (Tr. at 440-442). Plaintiff reported having a week with increased depression, but he stated that he had run out of Depakote. He had been out of that medication for almost two weeks. He had an appointment with his psychiatrist scheduled for the next day. "He shared that he has not heard from SSD about his appeal. While this concerns him, he does not feel it has contributed to his depressed mood. He did not follow-up with the referral to Vocational Rehabilitation." Plaintiff presented with poor hygiene. His affect was constricted, his mood depressed, his thought process was circumstantial. He was fully oriented with intact memory. He had interacted with friends during the past week and got back to writing poetry. Ms. Goodwin "tried to get Jason to think about what he will do if he is denied SSDI. He reported he simply doesn't have the will to do that. He reports feeling frightened when he thinks about being denied, so he simply can't think about what he will do if he is denied. He again stated that he will follow up with Vocational Rehabilitation 'probably next week.' . . . I told him about a part-time delivery job that I was aware is open and he agreed to contact the person who knows details about the job. . . . Again, Jason agreed to follow up with Vocational Rehabilitation." Stressors were noted to be "still no word from SSD and medication not renewed by psychiatrist" in addition to finances, housing, occupation and social environment.

On February 9, 2011, plaintiff saw Della Goodwin for individual therapy (Tr. at 437-439). "Jason started session by stating that he still hasn't heard from Social Security on the outcome of his appeal hearing. He reports creditors continually calling and how anxiety provoking it is. He feels tired he said and just wants to avoid everyone again. . . . He stated that

47

his father is over worked and how badly [plaintiff] feels for having to financially depend on his parents.  He also spoke about how upset he is with his brother-in-law and sister for the way they have been talking to him about depending on his parents for money."  Ms. Goodwin noted that plaintiff had good hygiene, he was appropriately dressed, his thoughts were intact and goal directed, he was fully oriented with intact memory.  He was depressed and anxious.  "I again encouraged him to schedule an interview with the housing director through Transitions. I helped him understand how they determine how much SSI he receives based on how much SSDI he receives.  With that he came to understand that he would not be able to stay in the apartment where he is currently living.  He cannot imagine himself living with a roommate or his grandmother in Kansas."  She noted that his stressors were severe and consisted of finances, housing, occupation and social environment.

On February 23, 2011, plaintiff saw Della Goodwin for individual therapy (Tr. at 434-436).  "Jason shared that he still hasn't learned the results of his SSDI appeal hearing.  He said he decided to stop thinking about it. He reported this has lowered his stress level and allowed him to enjoy this past week."  Plaintiff "ran into a woman in Barnes and Noble . . .  He also shared that while he has spent some time with his parents and sister, no one is mentioning his disability or the money his parents is [sic] giving him to support him. He is thankful for the reprieve from shame and guilt."  Ms. Goodwin noted that plaintiff's thought process was intact and goal directed, his affect was full range and his mood was euthymic.  He seemed at peace. He reports taking his medication as prescribed.  His interest in people and activities he used to enjoy has returned somewhat, as he reports good days.  He was sketching again.  Plaintiff said he planned to continue doing what he enjoyed -- reading, writing and sketching -- without stressing about the judge's upcoming ruling.  Ms. Goodwin supported that decision.  She noted

that his stressors were severe and related to finances, housing, occupation, and social environment.

On March 15, 2011, plaintiff saw Della Goodwin for individual therapy (Tr. at 431-433). Plaintiff's mother helped him with spring cleaning and he was happy to have a clean apartment. He spoke with someone about a Transition's Independent Living apartment program. Plaintiff's hygiene was good and he was dressed appropriately. "Jason and I spoke about not yet hearing from the SSD appeal Judge and re-applying for food stamps. He has contacted his lawyer who hasn't spoken to him directly, but rather a receptionist tells him they haven't heard either and that he should just keep waiting. I suggested that he ask to speak directly with his lawyer and if he is denied, to then talk with the Social Security Administration. I also encouraged him to re-apply for Food Stamps." Plaintiff had planned to go to a movie with an old high school friend and her husband. "I also encouraged him to talk with Cara about Transition's 2 work programs." Because the work training programs were not full-time, he agreed to "at least try doing them."

On March 30, 2011, plaintiff saw Della Goodwin for individual therapy (Tr. at 428-430). Plaintiff said he had been approved for an apartment with Transitions, but he would have to give up his two cats and he did not think he could do that. Plaintiff agreed to walk at a nearby trail for 30 minutes a day. His stressors were listed as finances, housing, occupation, social environment.

On April 13, 2011, plaintiff saw Della Goodwin for individual therapy (Tr. at 425-427). Plaintiff's depression had improved. He had been keeping his apartment clean. "He also shared that his lawyer did write to the disability judge about Jason's case and the judge wrote back saying he couldn't discuss the case and that the case is still pending (on what no one is sure). Jason said he did apply for food stamps and has a telephone interview this Friday

morning at 8:45 am.  He said he also applied for section 8 housing but the wait list he was told was two years. He is on the list for consideration of the new apartments at Transitions. . . .  I explained that I had encouraged him to apply for Public Housing, not section 8.  I provided him with another brochure specifically about Public Housing."  Ms. Goodwin again talked to plaintiff about the benefits of Vocational Rehabilitation.  Plaintiff said he had been walking around the block several times a week when the weather was warm.  Plaintiff agreed to apply for public housing, to schedule an appointment with Vocational Rehabilitation, and to apply for an explore volunteer opportunities at the Botanical Garden.  Ms. Goodwin noted that plaintiff's Axis IV assessment was "severe" and related to finances, housing, occupation, social environment.

On April 18, 2011, plaintiff saw Jonathan Boswell, a physician's assistant, for a cholesterol check (Tr. at 422-424).  He also complained of a headache which started about a month ago.  Tylenol and caffeine dulled the pain.  "Negative for psychiatric symptoms." Plaintiff said his psychiatric symptoms were stable on his medication.  Plaintiff had an x-ray of his cervical spine due to his complaints of headache (Tr. at 421).  It was normal.

On May 4, 2011, plaintiff saw Della Goodwin for individual therapy (Tr. at 418-420). Plaintiff said he had not gotten a decision on his disability application and that he had heard the judge has six months to make a decision.  His hearing was about six months ago.  He had made several paintings over the past week.  "He did not follow through with anything we had talked about last session because of his anxiety."  Ms. Goodwin asked why he had not followed through with Vocational Rehabilitation, and he asked for another pamphlet about it.  He agreed to call for an application.  His stressors were listed as finances, housing, occupation, social environment.

On May 24, 2011, plaintiff saw Della Goodwin for individual therapy (Tr. at 415-417). Plaintiff reported severe anxiety while waiting for the judge's decision on his disability application. "[H]is mother has told him they can't keep financially supporting him, and the time is getting nearer that he has to make a decision about the Catalpa apartment program." Plaintiff had been spending his time painting and downloading music from CDs he got from the library. He had not even gone to see the Catalpa apartments and therefore did not know whether he would like them or when they would be ready to rent. Ms. Goodwin noted that the change in mental status was due to plaintiff's mother saying she could not continue to financially support him.

On June 14, 2011, plaintiff saw Della Goodwin for individual therapy (Tr. at 412-414). "Jason showed me Judge Gillet's ruling concerning his Social Security Disability appeal hearing. Jason was awarded disability from April 2009 - May 2010, but denied over all. Jason had highlighted the areas in the report that he disagreed with. It seems there were several miss understood [sic] situations and confusion about which doctor was seeing him in what frequency, which appeared to heavenly [sic] influence the judge's determination. Jason said he has contacted his lawyer several times, but he has not returned his calls. Jason also said that since all of Transition's apartments he might have been eligible for went to Joplin patients, he did not get one of the new apartments, so his parents urged him to renew his lease for another year. Jason reported he has no idea what he is going to do at this time." Plaintiff had an upset and anxious mood. His thought process, orientation, memory, and speech were normal. His motor activity was calm. Plaintiff said he did not know whether he would appeal this ruling or reapply for disability. Ms. Goodwin encouraged him again to schedule an appointment with Vocational Rehabilitation. Ms. Goodwin noted that plaintiff's social phobia was improved, but his Axis IV problems were "severe" and were related to "finances, occupation."

## V.   *FINDINGS OF THE ALJ*

Administrative Law Judge James Francis Gillet entered his opinion on June 3, 2011 (Tr. at 9-19).  Plaintiff's last insured date is December 31, 2013 (Tr. at 11).

Step one.  Plaintiff has not engaged in substantial gainful activity since his alleged onset date (Tr. at 11).

Step two.  Since his alleged onset date, plaintiff has suffered from the following severe impairments:  affective disorders diagnosed as major depressive disorder and bipolar affective disorder II; anxiety-related disorders diagnosed as social phobia and panic disorder with agoraphobia; avoidant and dependent personality disorders; nicotine abuse; cephalgia (headache) migraine vs. tension; and multiple joint myalgias (Tr. at 11).

Step three.  Plaintiff's impairments have never met or equaled a listed impairment (Tr. at 11, 16).

Step four.  Prior to April 1, 2009, plaintiff had the residual functional capacity to perform the full range of work at all exertional levels but with the following nonexertional limitations:  interacting with supervisors must have been brief such as pleasantries or directly related to work production or job related, and occur no more than occasionally.  If those limitations were fulfilled he had no more than mild limitations.  He could not have been required to have contact with the public.  He had mild limitations in understanding, remembering and carrying out short simple instructions, but marked limitations in carrying out complex instructions from SVP 3 through SVP 9.  However, he had the ability to discriminate by written information on what simple alternatives he should choose in performing otherwise routine 4-step work activity.  He had no more than mild limitations in adapting to work at the SVP1 and 2 levels (Tr. at 12).  With this residual functional capacity,

plaintiff was capable of performing his past relevant work as a forming machine operator (Tr. at 5).

Between April 1, 2009, and May 31, 2010, plaintiff had the residual functional capacity to perform the full range of work at all exertional levels but with nonexertional limitations:  He had marked limitations in the ability to perform activities within a schedule, maintain regular attendance, be punctual within customary tolerances, work in coordination with or proximity to others without being unduly distracted by them, make simple work-related decisions, get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes, maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness, and set realistic goals or make plans independently of others.  He had extreme limitations in the ability to maintain attention and concentration for extended periods, complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable numbers and length of rest periods, accept instructions, and respond appropriately to criticism from supervisors (Tr. at 14).  With this residual functional capacity, plaintiff could not perform any of his past relevant work (Tr. at 15).

After May 31, 2010, plaintiff had the residual functional capacity to perform the full range of work at all exertional levels but with the following nonexertional limitations:  interaction with supervisors must be brief such as pleasantries or directly related to work production or job related, and occur no more than occasionally.  If those limitations are fulfilled he has no more than mild limitations.  He has a marked limitation regarding contact with the public.  He has marked limitations in carrying out complex instructions from SVP 3 through SVP 9.  He has mild limitations in adapting to work at the SVP 1 and 2 levels. For example, his work would have to be routine 3-step work activity without requiring

discrimination (Tr. at 16). With this residual functional capacity, plaintiff can perform his past relevant work as a forming machine operator (Tr. at 18).

Step five. From April 1, 2009, through May 31, 2010, there was no job available in significant numbers that plaintiff could perform (Tr. at 15).

## VI.   *DECREASE IN MEDICAL IMPAIRMENTS*

Plaintiff first argues that the ALJ erred in finding that plaintiff's disability ended on May 31, 2010, because there was no decrease in medical impairments on that date. Plaintiff's argument that one must "pop" from a disabling impairment to a non-disabling impairment on one particular day is neither accurate nor realistic. Although people can "pop" the other way, by suffering an accident or medical incident such a heart attack or stroke, both physical and mental impairments tend to improve gradually.

The ALJ found that plaintiff had materially improved "by" May 31, 2010. The record easily supports this finding. First, on June 11, 2009 (just over two months after plaintiff's disability began), Dr. Sutton stated that "while symptoms may continue to be more than non-severe it is anticipated that by duration of 4/10 he will be able to complete moderately complex tasks in settings with limited social contact." He based this prediction on the fact that plaintiff stabilized quickly once he went to the hospital and was put on medication and that with continued treatment further improvement was anticipated.

Second, Dr. Murrell stated in January 2010 that plaintiff would need a minimum of one year of individual therapy sessions. Dr. Murrell did not make it clear whether he meant a year of individual therapy sessions since plaintiff's psychiatric care began (April 2009) or from that date (January 2010); however, because plaintiff had been participating in individual therapy sessions and because Dr. Murrell was not a treating psychologist but just one consulted for a

second opinion, it is reasonable to assume Dr. Murrell meant a year from the beginning of plaintiff's treatment.  Again, that would be in approximately April 2010.

Third, the medical records that post-date May 31, 2010, support a finding that plaintiff was not disabled any time after that date.  The first medical record after that date was outpatient therapy with Victoria Incrivaglia who noted that although plaintiff was told to try to go to a fast-food restaurant and eat there (to force him to "confront" his anxiety about being in public), plaintiff ate at a sit-down restaurant six times in one week and reported that it was only uncomfortable the first few times.  He was able to focus on relevant topics, he was active and verbal in the session, he was dressed appropriately.  She noted that he was choosing to stay up very late into the early morning hours and then he did not feel like getting up in the morning.  She noted that his motivation was only fair and that despite claiming to have financial concerns he ate at restaurants much more frequently than was suggested as treatment to confront his alleged fears.  This, incidentally, was plaintiff's third and last appointment with Ms. Incrivaglia who clearly told him things he did not want to hear.  Rather than continue therapy with her, he chose to forego individual therapy for the next few months and then return to Ms. Goodwin whose main assistance was helping plaintiff try to get Medicaid coverage, food stamps, extensions on unemployment benefits, Social Security disability benefits and free housing, and who repeatedly suggested (for a period of an entire year, July 2009 through June 2010) that plaintiff check into Vocational Rehabilitation, part-time work, and volunteer work but who never criticized him or made him feel guilty for ignoring those suggestions related to getting a job or doing something productive with his time. Plaintiff did not see Ms. Incrivaglia again after that June visit, and he did not participate in individual therapy again until September 2010 when he started back up with Ms. Goodwin.

Plaintiff's first appointment with his psychiatrist after May 31, 2010, occurred on June 10. Dr. Bains noted that plaintiff's anxiety was controlled with Klonopin despite plaintiff's reports of increased anxiety due to having gotten two traffic tickets that day. By the end of June 2010, plaintiff had reported increased energy and motivation and improved depression. His report of "some anxiety" was related to being unable to find a job despite trying. In mid July 2010, Dr. Bains noted that on the last visit there had been no medication changes. Plaintiff was doing well on his medications with no side effects. Depression and mood swings had improved significantly, he was "able to get out of bed," sleep was good, appetite was good, anxiety and panic attacks were in control. He was having no suicidal or homicidal ideation, he had no psychosis, no involuntary movements, and his mood was euthymic. Everything in this record states that plaintiff's mental condition was normal and stable. He was continued on his same medications. This was the final record of plaintiff having seen Dr. Bains. In January of 2011 he told Ms. Goodwin that he had run out of his medication about two weeks earlier but that his psychiatrist would not refill it over the phone and that plaintiff had a psychiatric appointment the following day. This suggests that the lack of records from Dr. Bains's office is not because they simply were not produced -- it is because they do not exist. Plaintiff did not return to see his psychiatrist after July 2010 when it was noted that he was doing just fine. Plaintiff saw Jonathan Boswell, a physician's assistant, in April 2011 -- nearly a year after the ALJ found that his disability had ceased. That record includes the following notation: "Negative for psychiatric symptoms." Plaintiff said his psychiatric symptoms were stable on his medication.

As far as his individual therapy after May 31, 2010, as mentioned above, plaintiff saw Ms. Incrivaglia for outpatient therapy on June 7, 2010, and was noted to have only fair motivation. She wrote that, "It seems like Jason is capable of changing behaviors in his life, but

at this point he has little motivation for those changes." Plaintiff had no individual therapy after that until September 29, 2010 -- four months after the ALJ found that plaintiff's disability ended. His individual therapy from that point on focused on one thing -- his financial situation:

On September 29, 2010, he was very anxious about his upcoming disability hearing. His parents told him that if he does not receive disability he cannot live with them and he would have to live with his grandmother. His mental status exam was completely normal that day -- appearance, orientation, behavior, psychomotor behaviors, speech, memory, intellect, attitude, attention, reasoning, impulse control, judgment, insight, thought content -- with no suicidal or homicidal ideation.

On October 19, 2010, he said he was able to sleep and felt rested in the morning, his hygiene was normal, his affect was appropriate and congruent, his mood was stabilized.

On November 3, 2010, his affect was bright, his mood euthymic, he was rested and well groomed, insightful with intact and goal-directed thought processes. He was fully oriented with intact memory. He said he enjoyed being alone.

On December 6, 2010, he said he was anxious and depressed about his disability hearing, which apparently had not gone as he expected. He ran out of his medication five days earlier. He had been able to go out to lunch and out to dinner the day before. His worry was over not receiving disability benefits and having to live with his grandmother.

On December 21, 2010, he was stressed because his family said they were not going to support him anymore. He was worried about not getting disability, and his unemployment benefits had run out. His case worker had talked to him about Transitions housing but he did not want a roommate which was a requirement. He was fully oriented, his psychomotor behaviors were normal, his memory was intact, intellect bright, attitude cooperative, normal attention and insight, logical thought processes, and normal thought content. His depression and flat affect were based solely on his worry over the consequences of not getting disability benefits.

On January 12, 2011, plaintiff had increased depression due to having run out of Depakote several weeks earlier. He expressed feeling frightened when he thought about being denied disability benefits.

On February 9, 2011, he said creditors were continually calling and he still hadn't been awarded disability benefits, which was causing anxiety. He felt guilty for financially depending on his parents and his family disapproved of this financial reliance which made his guilt even stronger. He again expressed his displeasure of the idea of living with his grandmother or having a roommate.

On February 23, 2011, he said he decided to stop thinking about his disability case, and he enjoyed his days and had a lower stress level. He ran into a woman at Barnes and Nobel, so clearly he was going to public places because he wanted to, not because it was part of therapy. His family had not said anything about his financial dependence on his parents which gave him a "reprieve from shame and guilt."

On March 15, 2011, they talked about him insisting on talking to his lawyer or calling SSA himself. He planned to go to a movie with an old friend. There was no more discussion about having difficulty leaving his house or interacting with others, and there had not been for some time.

On April 13, 2011, almost the entire record is about plaintiff's benefits. SSA had written a letter to plaintiff's attorney saying the case was still pending. He applied for food stamps. He applied for Section 8 housing. He got on the waiting list for a new apartment at Transitions. He was encouraged to apply for public housing. He had been walking around the block several times a week when the weather was warm. They talked about him exploring opportunities at the Botanical Gardens. There was no discussion about any difficulty leaving his home or interacting with others.

On April 18, 2011, plaintiff told PA Boswell that his psychiatric symptoms were stable on his medication.

On May 4, 2011, plaintiff said he had made several paintings over the past week but didn't follow through with anything Ms. Goodwin had suggested on the last visit "because of his anxiety."

On May 24, 2011 -- nearly a year after the ALJ found plaintiff was no longer disabled, his severe anxiety again was over not having been awarded benefits yet, having to rely on his parents financially, and being told by his mother that they could not keep financially supporting him. He had been getting music from the library, again an indication that if it was interesting to him, plaintiff was able to go to public places.

On June 14, 2011, plaintiff had an upset and anxious mood because he had been awarded only 14 months' worth of disability benefits. Despite that, his thought process, orientation, memory, and speech were normal. His motor activity was calm. His social phobia was "improved." The only thing not normal was his "severe" problems of "finances and occupation."

Plaintiff participated in group therapy during the summer of 2010 after his disability ended. These records also support the ALJ's finding that plaintiff was no longer disabled as of this time.

On July 7, 2010, his stresses were listed as having run out of unemployment benefits, having no job, and being told his family could not longer help him financially. He was "very forthcoming" in talking to members of the group, he was able to talk to

the group members, ask them questions, and provide feedback when they asked him questions.

On July 13, 2010, he was very verbal and interactive with the group. There had been no change in his mental status.

On July 20, 2010, the group discussion was about Congress reinstating unemployment benefit extensions and the members of the group talked to plaintiff about public housing.

On August 3, 2010, plaintiff's mood was depressed because he was very concerned about having to move in with his parents due to finances. "[I]ncreasingly depressed because of his financial distress."

On August 10, 2010, plaintiff talked to a group member about public housing.

On August 17, 2010, there was again no change in plaintiff's mental status. He mentioned that he did not think he could stay awake during the day to go to interviews "right now."

On September 7, 2010, there was again no change in plaintiff's mental status. September 14, 2010, was the last group session.

The evidence in the record clearly supports the ALJ's finding that plaintiff was not disabled as of May 31, 2010. Whether he was actually disabled before that is not an issue before me, as the government has not challenged the finding that plaintiff was disabled for 14 months, and plaintiff does not put forth any specific argument that he was disabled from his alleged onset date of May 13, 2008, to the date his disability began, May 1, 2009. I do note for the record, however, that plaintiff saw Dr. Moose one time during that time period -- on June 17, 2008. At that time he was healthy appearing, well dressed, well groomed, and articulate with good eye contact. He was noted to have benefitted from Wellbutrin and Lexapro but by the following spring was on no medication at all. He complained of increased incidents of migraine headaches but said they were relieved with over-the-counter pain medicine and sleep. He was given a new antidepressant which would hopefully not contribute to headaches and told to return in four weeks; however, he did not return for any medical care for the next

ten months and did not continue taking antidepressant medication. There is no evidence that plaintiff was disabled prior to April 1, 2009.

## VII.   *CREDIBILITY OF PLAINTIFF*

Plaintiff argues that the ALJ erred in finding that plaintiff's testimony was not credible.

The credibility of a plaintiff's subjective testimony is primarily for the Commissioner to decide, not the courts. Rautio v. Bowen, 862 F.2d 176, 178 (8th Cir. 1988); Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987). If there are inconsistencies in the record as a whole, the ALJ may discount subjective complaints. Gray v. Apfel, 192 F.3d 799, 803 (8th Cir. 1999); McClees v. Shalala, 2 F.3d 301, 303 (8th Cir. 1993). The ALJ, however, must make express credibility determinations and set forth the inconsistencies which led to his or her conclusions. Hall v. Chater, 62 F.3d 220, 223 (8th Cir. 1995); Robinson v. Sullivan, 956 F.2d 836, 839 (8th Cir. 1992). If an ALJ explicitly discredits testimony and gives legally sufficient reasons for doing so, the court will defer to the ALJ's judgment unless it is not supported by substantial evidence on the record as a whole. Robinson v. Sullivan, 956 F.2d at 841.

In this case, I find that the ALJ's decision to discredit plaintiff's subjective complaints is supported by substantial evidence. Subjective complaints may not be evaluated solely on the basis of objective medical evidence or personal observations by the ALJ. In determining credibility, consideration must be given to all relevant factors, including plaintiff's prior work record and observations by third parties and treating and examining physicians relating to such matters as plaintiff's daily activities; the duration, frequency, and intensity of the symptoms; precipitating and aggravating factors; dosage, effectiveness, and side effects of medication; and functional restrictions. Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). Social Security Ruling 96-7p encompasses the same factors as those enumerated in the Polaski opinion, and additionally states that the following factors should be considered:

60

Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; and any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board).

The specific reasons listed by the ALJ for discrediting plaintiff's subjective complaints of disability are as follows:

> At the hearing, the claimant testified that he had no more group therapy scheduled and that if it was determined he still needed such therapy, he would have been placed in another group situation. There has been no additional therapy since the initial session, which he appears to have completed satisfactorily. In the therapy session he attended, he addressed and conquered many of his anxiety issues regarding being out alone and around groups of strangers as well as many other issues. Much of his testimony was related to his worst-case scenarios in the record that he has long since addressed and improved. He had been desensitized to the point he could go out to a busy restaurant and eat there alone. This would be a difficult task for many people. Yet the claimant does this at least two or three times a week. Even when he was depressed he was able to convince his parents to fly him to San Francisco to attend a showing of his artwork. Since difficulty being around strangers was one of his main concerns, one can see how far he came during his period of treatment. He does not need individual therapy, completing only group therapy before his period of disability ended. He is scheduled for no further group therapy, and has no plans for more group therapy. His only mental health contact is a once every 4 month medication check. These are all signs of a stable individual who is functioning well, and who has made significant medical improvement. During this period it is the absence of significant mental health evidence that shows his improvement. Thus, his testimony is found credible, but only related to the period during which he is found disabled, between April 1, 2009 and May 31, 2010, when he had significantly medically improved. In his last group therapy session, he was more interested in relying on disability than focusing on methods to handle job stress and conflicts.
>
> The claimant's motivation to improve was described as only fair, and this is a theme consistent throughout the claimant's medical record. He did not speak of making any changes in his life choices, as he had done in the past. A therapist said, "He seems to assume that there will be disability benefits available for him," so it is not necessary for him to continue to work in group therapy. He had made significant progress, but did not want the records to reflect too much progress. There are no further records after this June 2010 record. However, the records do reflect substantial progress as long as the claimant was willing to work toward improving.
>
> The claimant's testimony regarding limitations of concentration were only related to high level functioning such as reading and implementing blue prints and other such

activities well above the SVP 2 level.  Therefore, he would have no difficulty attending
to and carrying out SVP 2 level work.  Group therapy notes indicate that the claimant
was active and able to get along well with those in his group, despite the sensitive and
personal nature of the interaction.  Therefore, he could easily handle the limited contact
called for in the determined residual functional capacity.  The claimant had no
difficulty adhering to the rules and changes in topic with emphasis on others involved
in the group therapy situation.  He should easily handle the types of routine changes in
an unskilled work environment.

(Tr. at 17).

Plaintiff's earnings record shows that he worked for less than 3 years after having

graduated from college in 2006.  Furthermore, his earnings did not change significantly once

he received his college degree.

Plaintiff collected unemployment benefits for as long as he could, despite claiming

during that entire time that he was disabled and unable to work any full-time job.  Searching

for other work and receiving unemployment benefits is inconsistent with a claim of disability.

Lansford v. Barnhart, 76 Fed.Appx. 109 (8th Cir. 2003).  See also Cox v. Apfel, 160 F.3d 1203

(8th Cir. 1998)  (the acceptance of unemployment benefits, which entails an assertion of the

ability to work, is facially inconsistent with a claim of disability).  Plaintiff stated while in the

hospital in April 2009 that he had been looking for a job the entire ten months since he had

been unemployed, he told Ms. Goodwin in October 2009, that he had applied for two part-

time jobs, in November 2009 he said he was going to collect his unemployment benefits for the

next six months and not worry about looking for a job and instead was going to "focus on

healing," and in May 2010, Ms. Incrivaglia wrote:

The client expressed his concern regarding his unemployment benefits and that he has
received an extension on it. He has expressed his concern regarding the future of these
benefits. He applied for disability more than one year ago, but he has not heard
anything positive yet. . . .  It is his belief system that says since he is uncomfortable
around others then he has a disability and cannot work. . . .  The client came in
reporting that he was diagnosed as bi-polar; however, I am uncertain if that is the
correct diagnosis for him.  It seems that the client has a belief system that he is unable
to work as well as the fact that he does not need to change anything in his life choices.

62

> He seems to assume that there will be disability benefits available for him; he does not talk in terms that he can change his distortions and can learn to handle job stress and conflicts.

Plaintiff's motivation to make changes in his ability to deal with job stressors was noted to be lacking. However, if he was interested in something, the motivation was clearly there. For example, he testified that although he was disabled due to social phobia, he was able to do an art show in San Francisco because "talking about my art is one of the few things that I can actually, you know, once you get me going, I can actually keep going for a while". When plaintiff was in the hospital ten months after having lost his job, he said he wanted to get employment "that is related to what he trained for and what he is paying his student loans off for." He said he was trying to present his art in galleries but it was not going well, and he was trying to get his art into local galleries. In October 2009, he said he did not have the motivation to do any of the things his counselor had talked to him about in their last session, yet he was motivated to find someone to date because he wanted a sexual relationship. When plaintiff got called for jury duty, his stress was not due to having to interact with people or leave his home, it was a fear of having to participate in a criminal trial which might leave him with bad memories. Without any assistance from any mental health provider, plaintiff was able to write a letter and get excused pretty much immediately. Plaintiff's counselor tried to help him secure free housing, but he wanted free housing without a roommate and without having to give up his cats. In January 2011, plaintiff had still not been motivated to contact Vocational Rehabilitation, but he had found the motivation to interact with friends and write poetry. It was the same in May 2011 -- plaintiff had not followed through on anything his counselor suggested, but he had made several paintings over the previous week. The record supports the ALJ's credibility finding in that it establishes that plaintiff's motivation to find a

job (and specifically a job not related to creating art) is not nearly as strong as his motivation to do other things which interest him.

Plaintiff contradicted himself with regard to his daily activities. In his administrative paperwork he reported reading and watching television almost all day, yet he testified during the hearing that he does not read or watch television at all because of lack of concentration. In a Function Report plaintiff said he shopped in stores for books, DVDs, art supplies and music. However, during the hearing, he testified that he had to force himself to run in and out of a store for necessities, i.e., food.

Plaintiff testified in November 2010 that he has a panic attack once or twice a week. However, the medical records show that plaintiff's last alleged panic attack was prior to his April 1, 2010, visit with Dr. Bains, i.e., more than seven months ago. At that time, plaintiff indicated he thought his medication dosage needed to be increased, but Dr. Bains said no. On July 15, 2010 -- about four months before his hearing testimony -- plaintiff told Dr. Bains his panic attacks were under control. In March 2010, he said he was not having panic attacks. In February 2010, he reported having two panic attacks a couple days earlier. There are no more references to panic attacks in the year before the hearing. Therefore, instead of actually having one or two panic attacks a week, the record shows that plaintiff had approximately three panic attacks during 2010.

During the November 2010 hearing plaintiff testified that he was seeing Dr. Bains every two weeks to get prescription medications. However, the record shows that plaintiff saw Dr. Bains nine times during the entire year of 2010, and at the time of the hearing plaintiff's last appointment with Dr. Bains had been about four months earlier. Plaintiff testified that Dr. Bains was still trying to adjust his medication levels; however, Dr. Bains had not adjusted plaintiff's medication since the first half of 2010. Plaintiff testified that Ms. Goodwin was

working with him on anxiety issues right now before going onto depression. However, in the appointments with Ms. Goodwin immediately prior to his hearing testimony, the following was noted:

> 11/3/10 - plaintiff's affect was bright, his mood euthymic, he appeared rested and well groomed, he was insightful and his thought process was intact and goal directed. He was fully oriented with intact memory. Ms. Goodwin did not discuss further anxiety or depression.

> 10/19/10 - plaintiff's hygiene was normal, he looked rested, his affect was appropriate and congruent, his mood stabilized. She did not discuss anxiety or depression further.

> 9/29/10 - plaintiff's appearance was appropriate, he was oriented times four, his behavior was normal, his psychomotor behaviors were normal, speech was appropriate, memory was intact, intellect was bright, attitude was cooperative, attention was normal, reasoning was fair, impulse control was fair, judgment was fair, insight was fair, thought content was normal. His anxious and depressed mood was due to his upcoming disability hearing. There was no discussion about working on anxiety or depression issues.

Plaintiff did not have any individual therapy with Ms. Goodwin between December 22, 2009, and September 29, 2010, i.e., no individual therapy with Ms. Goodwin for about 11 months before his hearing testimony. Although he saw her for group therapy during the summer of 2010, there was no indication in those records that she thought he needed to work on anxiety issues before addressing depression. In fact, she noted no change in his mental status in any of the group therapy sessions -- September 7, August 17, August 10, August 3, July 20, July 13, July 7 -- with the exception of stress due to financial difficulties.

Plaintiff testified that he suffers from severe fatigue, dizziness, and some nausea due to his medication. However, during his last medical appointment on July 15, 2010 -- about four months earlier -- Dr. Bains noted that plaintiff was doing well on his medication with no side effects. No medical record post dating plaintiff's last date of disability comments on any alleged side effects.

The ALJ adequately addressed the Polaski factors, and the substantial evidence in the record as a whole supports his finding that plaintiff's allegations of disabling impairments outside the 14-month period are not credible.

## VIII.    PLAINTIFF'S RESIDUAL FUNCTION CAPACITY

Plaintiff argues that the ALJ erred in failing to assess any physical restrictions after having found that plaintiff suffers from severe headaches and multiple joint myalgias. A severe impairment is an impairment or combination of impairments which significantly limits a claimant's physical or mental ability to perform basic work activities without regard to age, education, or work experience. 20 C.F.R. §§ 404.1520(c), 404.1521(a), 416.920(c), 416.921(a). Severity is not an onerous requirement. Kirby v. Astrue, 500 F.3d 705, 708 (8th Cir. 2007). However, to be considered severe, the impairment "must result from anatomical, physiological, or psychological abnormalities which can be shown by medically acceptable clinical and laboratory diagnostic techniques. . . and must be established by medical evidence consisting of signs, symptoms, and laboratory findings, not only by [the claimant's] statement of symptoms." Martise v. Astrue, 641 F.3d 909, 923 (8th Cir. 2011) (quoting 20 C.F.R. § 404.1508).

Plaintiff's severe headaches were reported to Dr. Moose (June 2008) as a side effect of Wellbutrin, which was then stopped. They were reported to the hospital staff in April 2009, to PA Boswell in May 2009, and to Dr. Meriweather in June 2009. Plaintiff's next complaint of headaches occurred in April 2011 -- eleven months after plaintiff's disability was found to have ended. The ALJ erred on the side of caution by finding that plaintiff's migraine headaches are a severe impairment. However, in none of those records does plaintiff allege any functional restrictions as a result of his headaches. Therefore, because there is no evidence in

this record that his headaches cause functional limitations, the ALJ did not err in failing to assess any.

Plaintiff testified that his depressive episodes make him feel muscle aches and pains. His depressive episodes were adequately addressed by the ALJ. The medical records include the following: In May 2009 Mr. Boswell, a physician's assistant, prescribed medication for pain but plaintiff was not to take more than ten per month, suggesting that his pain was not severe or regular. In September 2009, Mr. Boswell prescribed a muscle relaxer after plaintiff complained of muscle cramps. Both of those are during the period plaintiff was found disabled. In June 2010, outside the disability period, plaintiff told Ms. Incrivaglia that he suffered pain and didn't feel like getting up in the morning as a result. She noted that he was not going to bed until after midnight and that was likely why he was not feeling like getting up in the morning. There is no other evidence of multiple joint myalgias in the record; therefore, since the ALJ found plaintiff suffered from them he clearly was giving plaintiff the benefit of the doubt. There is no evidence that any joint myalgias resulted in physical limitations, and plaintiff did not allege any in his administrative paperwork or in his hearing testimony.

Finally, plaintiff argues that the ALJ erred in formulating plaintiff's residual functional capacity because he failed to provide a "logical bridge between the medical evidence and the result", citing Daniel v. Massanari, 167 F. Supp. 2d 1090 (D. Neb. 2001), and requiring remand, citing Kelley v. Callahan, 133 F.3d 583 (8th Cir. 1998).

The ALJ found that after May 31, 2010, plaintiff had the residual functional capacity to perform the full range of work at all exertional levels but interaction with supervisors must be brief such as pleasantries or directly related to work production or job related, and occur no more than occasionally. He should have no contact with the public. He is able to perform work at the SVP 1 and 2 levels, i.e., routine 3-step work activity without requiring

discrimination.  The lack of physical limitations has been addressed.  Plaintiff fails to indicate what further mental limitations are required by his post-May 31, 2010, condition.  He cites to pages 440, 441, and 455 of the record as displaying his complaint that manic episodes kept him from sleeping for three days and that he spent most of the week in bed with deep depression and trouble sleeping.  However, the record on those pages actually states as follows:

> [January 12, 2011] - Initially he stated he had no idea what may have triggered that episode if anything, however, as the session went on I learned he had ran [sic] out of his Depakote December 31, even after requesting a refill from his psychiatrist. His prescription has not been filled to date. . . .

This was after plaintiff had gone about six months without seeing his psychiatrist.

> [October 19, 2010] - Jason reported that last week he had such a manic episode that he couldn't sleep for three days and was so aggitated [sic] that he was shaking the entire time. He was able to get in to see his psychiatrist who started him on Restoril and Klonopin. He states he is now able to sleep and feels rested when he wakes up.

The records, however, show that plaintiff's last appointment with Dr. Bains was in July, not October, and that he was already taking Klonopin in July, it was not started in October.  There is no record of him taking Restoril in October 2010.  Furthermore, the next non-counseling record is dated April 2011 -- six months later -- and shows that plaintiff continued to take Klonopin but was not taking Restoril.

Daniel v. Massanari did not discuss any bridge or nexus requirement, and SSR 96-8p (quote above) does not explicitly require any such thing.  In Kelly v. Callahan, the court of appeals criticized the ALJ for failing to address the opinion of a treating physician which not only corroborated the claimant's allegations but was consistent with the other evidence in the record (of which there apparently was not much, with the exception of the ignored doctor's records).  In that case the ALJ also stated that a doctor is not permitted to provide an opinion as to the number of hours a claimant can work each day, and the court of appeals pointed out that such opinions are not only permitted but encouraged.  Neither of those cases support

plaintiff's argument that a particular bridge or nexus is required before an ALJ has escaped a mandatory remand.

I have been unable to find any Supreme Court case, Eighth Circuit Case, or Western District of Missouri case that requires such a bridge or nexus when an ALJ assesses a claimant's residual functional capacity. Although Judge Posner, from the Seventh Circuit Court of Appeals, has been quoted by some courts in other jurisdictions with respect to such a nexus, this court is not bound by those opinions but is required to follow the case law of the Western District of Missouri, the Eighth Circuit Court of Appeals, and the Supreme Court of the United States.

The ALJ is not required to provide each limitation in the residual functional capacity assessment immediately followed by a list of the specific evidence supporting this limitation. See SSR 96-8p. Such would not only be anathema to a finding based on "all of the relevant evidence," but would result in overly lengthy decisions containing duplicative discussions of the same evidence in multiple sections. McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000). Such a requirement for duplicative and exacting discussion of every piece of evidence would only add further delay to the current backlog of cases awaiting decision by an ALJ, a backlog growing by the day. As the Supreme Court has stated, "[t]he disability programs administered under Titles II and XVI are of a size and extent difficult to comprehend," Heckler v. Day, 467 U.S. 104, 106 (1984), and "[t]he need for efficiency is self-evident." Barnhart v. Thomas, 540 U.S. 20, 28-29 (2003) (internal quotations omitted).

The ALJ found that plaintiff could have no contact with the public and very little contact with supervisors, despite the record showing that plaintiff was able to eat in restaurants alone, with family and with friends. He was able to go to book stores. He was able to hang out with friends in the park. He was able to go walking outside when the weather was

69

nice.  He worried about a trip to Sikeston not because of being in public but because of coming up with money for gas.  He was worried about jury duty not because of being in public or interacting with people, but because he did not want to be left with bad criminal images in his mind.  He was able to get music from the library.  He interacted normally with every medical provider or examiner, with all of the people in the hospital, with all of the people in group therapy.  The ALJ found that plaintiff could only do work at the SVP level of 1 or 2, despite the record showing that plaintiff was able to read many books, download music, write poetry, watch movies, get out of jury duty, apply for food stamps and other forms of financial assistance, and try to get his art work on display at local galleries.  The record does not suggest that plaintiff needs any further restriction than that set out in the RFC as assessed by the ALJ.

## IX.    CONCLUSIONS

Plaintiff's stress and concern over his financial situation is certainly real, and it is certainly justified.  However, it is not disabling.  Unfortunately there are many people in plaintiff's situation. It is unfortunate that he lost his job, it is unfortunate that he has been unable to find a job in which he can use his artistic talent and training.  However, the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff's symptoms did not preclude all forms of substantial gainful activity prior to April 1, 2009, or after May 31, 2010.

Therefore, based on all of the above, I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff is not disabled.  Therefore, it is

ORDERED that plaintiff's motion for summary judgment is denied.  It is further

ORDERED that the decision of the Commissioner is affirmed.


/s/ Robert E. Larsen
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
August 27, 2013